The State of Ohio, Appellee, *v.* Cousin, Appellant.

(No. 13-81-26—Decided September 27, 1982.)

*Mr. Thomas R. Spellerberg,* prosecuting attorney, and *Ms. Elaine J. Knutson,* for appellee.

*Mr. Randall M. Dana,* public defender, and *Ms. Jody Gabriel,* for appellant.

Cole, P.J. This is an appeal from a judgment of conviction and sentence of the appellant by the Court of Common Pleas of Seneca County for the offense of voluntary manslaughter in violation of R.C. 2903.03(A). The defendant-appellant, Joselyn Cousin, asserts three assignments of error:

I. It is asserted that it is grounds for reversal when an indictment charging the defendant with murder is founded upon a death which has been determined by the county coroner to have been an accidental death and which ruling was not the subject of an operative order by the court of common pleas for a change thereof.

This general objection was the basis for a motion to dismiss early in the proceedings before the court of common pleas and essentially the assignment of error asserts that the trial court erred in not granting this motion.

The appellant's argument in support of this position is predicated upon the wording of R.C. 313.19 which reads as follows:

"The cause of death and the manner and mode in which the death occurred, as delivered by the coroner and incorporated in the coroner's verdict and in the death certificate filed with the division of vital statistics, shall be the legally accepted manner and mode in which such death occurred, and the legally accepted cause of death, unless the court of common pleas of the county in which the death occurred,

after a hearing, directs the coroner to change his decision as to such cause and manner and mode of death."

In the present case the death certificate issued for Jimmy Joe White, the decedent, and the report of the coroner's inquest were both attached as exhibits to the motion to dismiss. In the death certificate under "cause of death" appears (on a state of Michigan Department of Health form):

"Immediate cause: cardiac tamponade and hypovolemic shock with left hemothorax.

"Due to or as a consequence of alcohol intoxication, stab wound left chest.

"Due to or as a consequence of personality disorder."

The use of a Michigan form was later explained by the fact that although death occurred in the city of Fostoria the decedent was a resident of Detroit. A similar certificate on an Ohio form was an exhibit at trial.

At item 25 appears the word "accident." The "date of injury" was February 24, 1981, at 5:24 p.m. and under "describe how injury occurred" appears "accidentally stubed [sic] in a strugle [sic] by the common law" [sic].

In the report of the coroner's inquest appears the following:

"The deceased, Jimmy J. White, 6'4" tall, heavily build, drunk (alcohol level .245) was pulling slightly bend over Ms. Joselin [sic] Marie Cousin, 5'2" tall, toward himself, while she resisted with her right forearm, pushing herself away from him against his left chest. She did not realize or was aware of that she did have a knife in her right had [sic] as she walked out of the kitchen while preparing supper. The knife during this struggle held by Miss Cousins [sic] pierced the skin, the cartilage of the 2nd vertebrae and penetrated suddenly about four inches cutting into ascending aorta. The event was sudden, not realized by either person in the struggle. Mr. White started to walk toward the steps, stated he was hurt, turned back, grabbed Miss Cousins [sic] by the neck in half Nelson, then slumped, avoiding falling on the two small children. On inspection of the scene and inquiry of police and EMS technicians first on the scene confirmed that this was a woman that called an ambulance because she stabbed the man.

"The subsequent inquiry of the only eyewitness on 2-26-81 (see enclosed) provided no inconsistent answers to the evidence on the scene. The 14" taller man, capable of defense could not be stabbed downward at that heighth [sic], hardly accessable [sic] to the accused.

"The emotional reaction to the accidental deathly injury showed no iota of delay in securring [sic] help and quite appropriate hysterical and grief reactions."

The verdict was "accidental."

It is contended that the coroner's determination of accidental death made this the "legally accepted manner and mode in which such death occurred, and the legally accepted cause of death" in the absence of action pursuant to the statute and an indictment could not be based on this death.

The trial court overruled the motion based on this argument stating that the coroner's finding of the cause of death is "a professional opinion which can be challenged."

This statute has been twice declared to be unconstitutional as applied to civil actions. *State, ex rel. Dana,* v. *Gerber* (1946), 79 Ohio App. 1 [34 O.O. 48]; *Roark* v. *Lyle* (C.P. 1953), 68 Ohio Law Abs. 177, 180 [52 O.O. 166].

Both decisions are concerned with the attempt by the legislature to, in effect, vest judicial power in the coroner subject to the vague and indefinite procedure for apparent review by the court of common pleas. Section 1 of Article IV of the Ohio Constitution states:

"The judicial power of the state is vested in a supreme court, courts of appeals, courts of common pleas and divisions thereof, and such other courts in-

ferior to the supreme court as may from time to time be established by law."

The office of coroner is in no place designated by the legislature as constituting a court. The determination of criminal responsibility is necessarily a judicial function and, if this section be interpreted as appellant would urge, then the coroner could prevent the normal operation of the courts in determining criminal responsibility for death. However, we do not believe it need be so interpreted.

The statute speaks of "manner and mode" of death and of "cause" of death and the real issue is what this requires. In our opinion the scope and meaning of these terms must be ascertained in the light of the entire section pertaining to the office of the coroner.

Under R.C. 313.02, certain professional training and qualification as a physician are the basic qualifications for the office. The coroner is charged with autopsies and making certain medical findings. Bodies are buried or cremated ultimately and examination immediately by a qualified expert is quite essential to make determination of the causes of death while the evidence is available. But this pertains to the medical or physiological cause of death and it is reasonably clear why this determination could be given a presumption of validity. This constitutes a medical opinion on a medical question. The evidence necessary to the determination is only available during a relatively short period, and the matter is peculiarly within the special area of expertise of the coroner.

The mode or manner can refer to the surrounding physical mechanisms associated with the death, as for example, the thrust of a knife, the course of a bullet or the blow of a blunt instrument. Such things are intimately associated with the causal chain leading to the physiological change that resulted in death. However, this is as far as the assigned quality of expertise required for a coroner may go.

The assigning of ultimate causes, human intents and criminal responsibility is a matter for a different agency of inquiry, and is ultimately the subject matter of judicial inquiry. To say that the coroner is empowered by R.C. 313.19 to forestall prosecution, prevent further inquiry by prosecutors and police and grand juries from indicting is to interpret the section far more broadly than is warranted or required. We would conclude that limiting the meaning of "cause, manner and mode" to the immediate physical and physiological mechanisms involved in the death is fully compatible with the skills of the coroner, his required expertise and with the clearly evident necessities of the situation. As to human causation and criminal responsibility—these fall outside his area of expertise and to lend to his ventures into this area any degree of finality or presumption of correctness, we believe, goes far beyond the scope of the statute and is wholly inconsistent with the general patterns of law enforcement and justice.

We would note that in R.C. 313.09, pertaining to records of the coroner, appears the following:

"* * * The coroner shall promptly deliver, to the prosecuting attorney of the county in which such death occurred, copies of all necessary records relating to every death in which, in the judgment of the coroner *or prosecuting attorney* further investigation is advisable." (Emphasis added.)

This indicates the legislature contemplates further investigation by the prosecutor irrespective of the opinion of the coroner.

Again, R.C. 313.15, dealing with the time for holding a dead body in the coroner's custody, provides that he may hold such body until, after consultation with law enforcement officials, he has decided "it is no longer necessary to hold such body to decide on a diagnosis giving a reasonable and true cause of death * * *."

Here the statute appears to center on

the medical cause of death and not upon a determination of criminal responsibility.

In R.C. 313.17, provision is made for a coroner's inquest which involves the broader circumstances surrounding the death:

"The coroner or deputy coroner may issue subpoenas for such witnesses as are necessary, administer to such witnesses the usual oath, and proceed to inquire how the deceased came to his death, whether by violence to self or from any other persons, by whom, whether as principals or accessories before or after the fact, and all circumstances relating thereto. * * * A report shall be made from the personal observation by the coroner or his deputy of the corpse, from the statements of relatives or other persons having any knowledge of the facts, and from such other sources of information as are available, or from the autopsy."

Thus it would appear and we would conclude that the function of the coroner is to determine the physical or physiological cause of death and to assemble facts pertinent to the circumstances surrounding the death, but that "the cause of death and the manner and mode in which death occurred" when determined by the coroner do not contemplate a determination thereby as to the criminal responsibility for that death.

The criminal responsibility is the proper subject matter of inquiry by the grand jury. R.C. 2939.08 states:

"After the charge of the court of common pleas, the grand jury shall retire with the officer appointed to attend it, and proceed to inquire of and present all offenses committed within the county."

Provision is then made for the return of indictments and the process initiated by that return. This is the process by which ultimately criminal responsibility will be determined and it is difficult to believe that the criminal responsibility for murder should be concluded before this process is initiated and upon the conclusions of a single official after what is essentially an ex parte hearing. There is no provision for the notice to the prosecutor or to law enforcement officials when the inquest is conducted. The witnesses are those who are "necessary" in the opinion of the coroner.

In the light of the many and intricate procedures designed by the legislature for assigning criminal responsibility and the limited nature of a coroner's inquest, we cannot conclude the legislature intended to make the finding of the coroner conclusive as to this issue.

We therefore conclude the terminology of R.C. 313.19 must be given an interpretation which makes the coroner's verdict and death certificate the "legally accepted manner and mode in which such death occurred, and the legally accepted cause of death" only as to the physiological cause of death and the immediate mechanical, chemical or biological means by which death was caused, but does not extend to a determination of the criminal responsibility or non-responsibility of any human agency involved in the causal chain. The function of the coroner is ultimately that of an expert witness, who expresses an opinion on matter within the scope of his expertise, and not that of the courts which apply law to the facts and assign responsibility under the law.

But appellant argues there is an avenue to effect change: an order of the court of common pleas. It is apparent that this avenue is not clearly established. There is no indication as to who should initiate such a proceeding, who should be parties to it, or what the scope of the hearing should be.

In *State, ex rel. Dana, supra,* at page 14, it is said:

"We conclude further that the Legislature by that section attempted to vest the Court of Common Pleas with power to direct the coroner to change his finding in a civil matter so that it will thereafter have the force of a judicial decision without providing the method or

means by which such jurisdiction shall be exercised and without providing some mode or method which will guarantee the parties their constitutional rights to have their day in court and that it is, therefore, inoperative and void for uncertainty and indefiniteness."

We think this is also applicable in criminal matters. The procedures set forth are too ill-defined, too vague and too indeterminate to in any way result in a broader interpretation of the terms "cause," "mode" and "manner" than we here determine to be appropriate.

For this reason we conclude that the finding that the death of Jimmy Joe White was accidental by the coroner in no way precluded the indictment of the appellant by the grand jury or her ultimate trial for the alleged offense of murder. To hold otherwise would require a determination that the statute in its entirety is void as constituting an unconstitutional delegation of judicial authority to an agency other than a court.

We would quote briefly from an opinion of the Attorney General which is in conformity with our opinion:

"It is the duty of the prosecuting attorney to institute and prosecute actions in the enforcement of the laws of Ohio. Therefore, it is the prosecuting attorney's duty to apply the law to the facts and to determine what, if any, statute has been violated. The coroner, as a physician, is not qualified to make legal determinations.

"Therefore, it is my opinion, and you are advised that a coroner in his investigation of a death coming within his jurisdiction does not have the authority to apply law to the facts and determine what, if any, statute has been violated, and the legal responsibility of the persons involved." 1969 Ohio Atty. Gen. Ops. No. 69-036, at page 2-63.

The coroner does not, moreover, as we here determine, have the power to forestall judicial process by a negative finding.

The assignment of error is not well taken.

II. The appellant asserts that prejudicial error resulted when circumstantial evidence was relied upon to prove the essential elements of the crime, and that where the evidence does not, as a matter of law, preclude all reasonable theories of innocence, then a conviction based on such evidence must be reversed.

The appellant's statement of the law is correct, but is not applicable here as asserted.

In *State* v. *Kulig* (1974), 37 Ohio St. 2d 157 [66 O.O.2d 351], the syllabus states:

"Circumstantial evidence relied upon to prove an essential element of a crime must be irreconcilable with any reasonable theory of an accused's innocence in order to support a finding of guilt."

See further statements of this rule in *State* v. *Eley* (1978), 56 Ohio St. 2d 169 [10 O.O.3d 340]; *State* v. *Goodin* (1978), 56 Ohio St. 2d 438 [10 O.O.3d 533]; and *State* v. *Graven* (1978), 54 Ohio St. 2d 114 [8 O.O.3d 113].

In this last case the court stated, at pages 118-119:

"* * * Therefore, it is axiomatic that criminal conduct may be and, in many instances, can only be proved by circumstantial evidence. However, the circumstantial evidence relied upon to prove an essential element of the crime must be irreconcilable with any *reasonable* theory of the accused's innocence in order to support a finding of guilty. *State* v. *Kulig* (1974), 37 Ohio St. 2d 157 [66 O.O.2d 351].

"Thus, where circumstantial evidence is relied upon to prove elements of the crime, as in the cause *sub judice,* the jury must find it to be of such a conclusive and persuasive force that it excludes every reasonable hypothesis of innocence. This determination of the reasonable hypothesis as a jury prerogative was recognized by the Supreme Court of the United States in *Holland* v. *United States*

(1954), 348 U.S. 121, wherein the court stated, at page 140:

" 'Circumstantial evidence in this respect is intrinsically no different from testimonial evidence. Admittedly, circumstantial evidence may in some cases point to a wholly incorrect result. Yet this is equally true of testimonial evidence. In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference. In both, the jury must use its experience with people and events in weighing the probabilities. * * *.'

"Similarly, language in *State* v. *Sheppard, supra* (165 Ohio St. 293 [59 O.O. 398]), likewise implies that the determination of reasonableness includes a determination of whether the hypothesis is reasonable in view of the weight and credibility that the jury gives to the evidence. (See *State* v. *Williams* [1976], 47 Ohio App. 2d 330, 336 [1 O.O.3d 393].) In paragraph six of the syllabus in *State* v. *Sheppard, supra,* this court stated:

" 'Where circumstantial evidence alone is relied upon in the proof of any element of a crime, and the jury finds that there is a reasonable hypothesis of innocence, after considering all the evidence, it is its duty to acquit; however, where the *jury finds,* after full deliberation, that there is *no reasonable hypothesis of innocence based on the facts as it finds them to be,* and the facts which it finds are irreconcilable with any reasonable hypothesis other than guilt, it is its duty to convict.' (Emphasis added.)

"Thus, once the jury has reached its decision, an appellate court, in a case where circumstantial evidence is relied upon, will reverse only where the evidence is insufficient as a matter of law to enable the jury to exclude a reasonable hypothesis of innocence."

This court in *State* v. *Williams* (1976), 47 Ohio App. 2d 330 [1 O.O.3d 393], arrived at the same general statement in its syllabus:

"1. In those criminal cases where an essential element for conviction may be proved only by circumstantial evidence and where, considered in the abstract, the circumstantial evidence produces a reasonable hypothesis of innocence as well as a reasonable hypothesis of guilt, it is still the function and duty of the jury to attempt to resolve the conflict which exists between these hypotheses by considering all of the evidence in the case and giving to the circumstantial evidence upon which each hypothesis is based such weight and credibility as the jury deems such evidence deserves.

"2. If the jury then concludes that based on such considerations of weight and credibility the hypothesis of guilt excludes the hypothesis of innocence they may convict; if they conclude that the hypothesis of guilt does not exclude the hypothesis of innocence the jury must acquit.

"3. Where the circumstances are consistent with the hypothesis of the defendant's innocence as well as with that of his guilt, the jury must draw the inference, and an appellate court will not substitute its judgment for that of the jury."

Thus, the claim of the general thesis that where circumstantial evidence alone is used to establish an element of the crime the evidence must be such as to exclude any reasonable theory of innocence is well taken. However, the thesis is subject to two fundamental qualifications:

(1) The asserted alternative thesis of innocence must be reasonable and the determination of reasonableness is first and foremost a question for the jury.

(2) The asserted alternative thesis must be based upon testimony which is not the subject of rejection on grounds of credibility.

Here, the second qualification is peculiarly applicable. The fatal wounding of Jimmy Joe White occurred in a room occupied by four people at the moment of the alleged crime. One was the victim and two were small infants incapable of testi-

mony. The fourth person was the accused — the appellant now — whose testimony is obviously subject to serious problems of credibility. There is no question that the appellant stabbed the victim. The sole issue is whether this act was done knowingly or whether, as she now contends, it was a tragic accident occurring during the course of a struggle between the two.

Under such circumstances it is quite clear that the state had to and did rely upon certain circumstantial evidence and upon certain statements made by appellant as part of the *res gestae* and certain admissions later made by her.

The evidence clearly established the existence of a state of emotional tension between appellant and the victim minutes prior to the incident. This tension was serious enough to cause the appellant to pack the victim's clothing, place it in a bag, give him the bag and leave it for him at a neighbor's apartment with the words "Good-bye, Mr. White." The two had been living together five or six years; he was the father of her two children and evidence indicated she considered there was a common-law marriage in existence. As one witness put it:

"A.   She was angry.

"Q.   How could you tell that?

"A.   Well, I could look at her. She had been crying, and the way she said it. You know, it wasn't friendly like 'goodbye, Mr. White.' It was 'goodbye, Mr. White,' like that. It was final. It was 'goodbye, Mr. White,' like that. It was final. 'Goodbye.' "

The evidence clearly established the availability of the weapon — a kitchen knife which was in appellant's possession.

The victim left the neighbors and went to the appellant's apartment. A witness testified he was not angry: "He was smiling and laughing." He said "he was going in to see why she was mad at him." Within minutes after he entered, the altercation occurred and he was stabbed.

Several witnesses testified that the appellant came out of the apartment and "[s]he said I stabbed him and she wanted to know if he was dead. * * * She was saying it over and over." When she came out she was carrying a knife in her hand identified as similar to the one that stabbed the victim.

A next door neighbor testified, "I went to shut the door [in her own apartment] and as I went to shut the door I heard 'shut up' and then a thud * * *."

The appellant also told another neighbor that she had stabbed Jimmy Joe White one time in the chest.

The evidence established that the victim was six feet, two or three inches in height and the appellant was five feet, one or one and one-half inches tall. The nature of the wound was such that an inference could be drawn that the blow was forward and downward leading to a conclusion the knife was raised by the appellant at the time it entered the victim.

While correct grammar or usage of words is somewhat overlooked at times of emotional tension, nevertheless, the appellant, it may be concluded, clearly said she "stabbed" the victim. This is an active verb and leads to an inference the wound was the result of a voluntary stabbing motion by the appellant. Later some effort at qualification was made by the appellant to contend she did not mean to hurt the victim, but here we enter the realm of credibility reserved for the jury.

A rebuttal witness testified to a later conversation: "Jimmy Joe and her had an argument early in the afternoon and that he· had come back and they had a few choice words and he started coming at her and she said, 'I stabbed him.' * * * She said that he was walking toward her like he was going to choke her and that she stabbed him."

These admissions tend to establish a voluntary act, not an accidental occurrence.

Reviewing the circumstantial evidence there is ample basis for an inference of a knowing, voluntary act by the

appellant in stabbing the victim. There is actually nothing in the circumstantial evidence introduced by the prosecution and dependent on the credibility of its witnesses which leads to any reasonable alternative inference of accident. The only basis for such an inference rests upon testimony essentially by the appellant or in out-of-court statements made by her; the credibility of all such testimony was a matter for the trial jury to determine.

We would conclude there was no reasonable alternative inference of accident invoked by the state's case. There was an alternative theory of accident advanced by appellant, but it was not inherent in the state's case and was solely dependent upon assertions of defense witnesses subject to rejection by the jury on grounds of credibility.

The assignment of error is not maintained.

III. It is asserted that the trial court's instruction to the jury shifted the burden of proof to appellant to prove lack of knowledge thereby violating her right to due process.

We would first note that no objection was made by the appellant at the close of the court's instructions to the jury and before the jury retired for its deliberation nor to this portion of the court's charge when it was repeated in replying to a question by the jury. This assignment of error is an objection to the court's charge. Crim. R. 30 reads in part:

" A party may not assign as error the giving or failure to give any instructions unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

There is no assertion of, nor do we find the existence of, plain error. We proceed, however, to a brief consideration of the appellant's claim and find it is not well founded.

Appellant contends that R.C. 2901.22 (B) shifts the burden to the accused to prove that she did not know her conduct would cause a certain result.

R.C. 2901.22(B) reads as follows:

"A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."

This defines what the state must establish to prove the element of "knowingly" required by R.C. 2903.03(A). Here we are concerned with the first sentence which is concerned with an act. By definition a person acts knowingly when he is aware certain results will probably occur. The burden is on the state to establish that the defendant knew that her act would probably result in the death of the victim.

Thus, probability enters solely as a part of an element of the offense. It does not create any presumption but is itself an integral element.

When one asserts that a person intends the natural and probable consequences of an act we are concerned with proof of an intentional crime and a resultant presumption of a specific intent.

Here, however, the element of the offense is not intent but knowledge, and probability appears solely as a part of the definition. It is incumbent on the state to:

(1) Establish that the defendant's act would probably cause death, and

(2) Establish that she was aware of this probability.

Thus, probability does not create any presumption or shift any burden. It is an integral part of what the state must prove and the statutes (and instructions based thereon) do not shift any burden.

We further note that there is sufficient evidence to permit the jury to conclude beyond a reasonable doubt that the defendant was aware her act of stabbing the victim could probably result in his death. The character of the weapon, the

situs of the penetration and the force necessary for that penetration create a basis for a strong inference that the defendant knew the probable result of her act.

The assignment of error is not well taken.

Accordingly, the judgment of the trial court is affirmed.

*Judgment affirmed.*

MILLER, J., concurs.

WHITESIDE, J., concurring. Although I concur in the judgment and in the opinion with respect to the second assignment of error, with respect to the first assignment of error I cannot concur in the suggestion in the opinion of approval of *State, ex rel. Dana,* v. *Gerber* (1946), 79 Ohio App. 1 [34 O.O.48], and *Roark* v. *Lyle* (C.P. 1953), 68 Ohio Law Abs. 177, 180 [52 O.O. 166], to the extent that they indicate R.C. 313.19 may be unconstitutional. Cf. *State* v. *Sharp* (1954), 162 Ohio St. 173 [55 O.O. 88], and *State, ex rel. Stark,* v. *Zipf* (1961), 172 Ohio St. 462 [17 O.O.2d 427].

Rather, as indicated by the majority opinion, R.C. 313.19, properly construed, is constitutional.

Nor can I concur in the indication in the majority opinion that the coroner is only a medical officer charged with performing medical duties and rendering medical opinions. The county coroner is much more and is charged with many nonmedical public duties. *E.g.,* R.C. 2101.09 and 2335.31; and Civ. R. 45(C) and Crim. R. 17(D).

At English common law, the coroner held one of the most important civil offices second only to the sheriff and possessed *judicial,* as well as ministerial, power, the judicial power extending to inquiries concerning the manner of death of any person who died by violent or sudden means. See 18 American Jurisprudence 2d 516, Coroners or Medical Examiners, Section 1.

At common law, the coroner's inquest was for the purpose of ascertaining not only whether a homicide had been committed but also for the purpose of determining probable cause (but not guilt) as to the perpetrator of the crime. Thus, the verdict at a coroner's inquest was a substitute for a grand jury indictment.

This was essentially true under earlier Ohio statutes. R.S. 1221 provided for filing of the coroner's report with the clerk of the court of common pleas with further proceedings to be conducted in that court, and provided that the coroner should cause the arrest of any person "apparently guilty" of causing a death by violence. See *State, ex rel. Brown,* v. *Bellows* (1900), 62 Ohio St. 307. The general purpose of a coroner's inquest is well-stated in 18 American Jurisprudence 2d 520, Coroners or Medical Examiners, Section 7:

"* * * The object is to obtain information as to whether death was caused by some criminal act and to obtain evidence to prevent the escape of the guilty, as well as to furnish the foundation for a criminal prosecution in case death is shown to be felonious. The object of an inquest is not only to determine the cause of death but also to exclude other supposable or possible causes."

The nature of the powers exercised by a coroner at common law are to some extent at least quasi-judicial, as well-stated in 18 American Jurisprudence 2d 522-523, Coroners or Medical Examiners, Section 8:

"Courts have differed in their expressions of opinion as to whether a coroner acts in a judicial capacity. His acts in holding an inquest have been described as judicial, partly judicial, and quasi-judicial. On the other hand, it has been asserted that the coroner does not act judicially, or acts only ministerially, in holding an inquest, which is a mere finding and does not establish rights, and therefore his authority lacks the first element of judicial power. It has also been held that

while at common law the office of the coroner is judicial in its nature, it is otherwise under a state constitution vesting the judicial powers in the courts therein named, for no judicial power can be exercised by any other authority. Proceedings at an inquest are intended to be merely a preliminary investigation, and not a trial involving the merits. The verdict or finding is not binding on anyone as a judgment and, indeed, has none of the attributes of a judgment or decree. No rights or liabilities, either civil or criminal, are established or fixed thereby."

R.C. 313.19 provides that the "legally accepted manner and mode" of death and the "legally accepted cause of death" shall be that set forth in the coroner's verdict and in the death certificate "unless the court of common pleas, of the county in which the death occurred, after a hearing, directs the coroner to change his decision." The Eighth Appellate District in *State, ex rel. Dana, supra,* reasoned that this provision was unconstitutional because it invested judicial power in the coroner and made no specific provision for procedure in the court of common pleas.

In reaching that conclusion, the Eighth Appellate District overlooked R.C. Chapter 2719, which establishes a procedure for correcting errors or defects in a proceeding which is required to be made a matter of record, assuming that a special procedure be necessary as that court reasoned. Nor is there any merit to the conclusion that R.C. Chapter 313 confers unbridled judicial power upon the coroner. Not only is the power conferred limited, but there is a provision for judicial determination which may have evolved from prior law, rather than intended as a supplement to R.C. Chapter 2719.

The Ohio Supreme Court expressly held the duties of a coroner to be both ministerial and quasi-judicial in the second paragraph of the syllabus of *State, ex rel. Harrision,* v. *Perry* (1925), 113 Ohio St. 641. Accordingly, I would conclude that R.C. 313.19 is constitutional, but is limited in meaning and effect as set forth in the majority opinion herein.

The court in *State, ex rel. Dana, supra,* assumed that R.C. 313.19 provided not only for admission of the coroner's report in evidence in a civil proceeding, but also for conclusive effect to be given that evidence. Both conclusions are unfounded. R.C. 313.19 does not purport, either expressly or by implication, to establish a rule of evidence but, rather, only the "legally accepted" manner, mode and cause of death. There is nothing in R.C. 313.19 hinting at an intent to bind third persons who are not "parties" to the proceedings conducted by the coroner pursuant to R.C. 313.17. Thus, neither the defendant in a criminal case nor any party to a civil case could be bound by the coroner's determination, even assuming that the report would be admissible in evidence in either a criminal or civil case contrary to the holding in *Insurance Co.* v. *Schmidt* (1883), 40 Ohio St. 112.

At most, R.C. 313.19 connotes only a probable-cause determination by the coroner as to the manner, mode and cause of death, rather than a final determination having a *res judicata* effect. As is true of any proceeding, administrative or judicial, only those who are parties to a proceeding, or in privity with a party, are bound by a final determination in the proceeding. There is nothing in R.C. 313.19 purporting to give even that type of finality to a coroner's determination. See *State* v. *Manago* (1974), 38 Ohio St. 2d 223. The grand jury is a separate legal body having a duty to make a determination predicated upon evidence of probable cause to believe that a specific person committed a specific crime. While the coroner's report may be evidence before the grand jury, there is nothing in R.C. 313.19 purporting to bind the grand jury by the coroner's report, even if the coroner reached a different probable-cause determination. This is no different than a discharge at a preliminary hearing before a magistrate

finding no probable cause followed by an indictment by a grand jury finding probable cause. There is no *res judicata* effect to the coroner's report under R.C. 313.19 or otherwise.

Accordingly, I concur in the judgment and in the opinion to the extent indicated for the reasons set forth above.

WHITESIDE, J., of the Tenth Appellate District, sitting by assignment in the Third Appellate District.