The STATE of Ohio, Appellee,

v.

SAAH, Appellant.

[Cite as *State v. Saah* (1990), 67 Ohio App.3d 86.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 56651.

Decided March 26, 1990.

88

*John T. Corrigan,* Prosecuting Attorney, and *Leonard D. Hall,* Assistant Prosecuting Attorney, for appellee.

*Henry F. DeBaggis,* for appellant.

---

JOHN F. CORRIGAN, Judge.

The defendant appeals from his jury trial convictions for arson of another's property (see R.C. 2909.03[A][1]) and arson with purpose to defraud (see R.C. 2909.03[A][2]). In his first assignment of error, the defendant complains that the trial court erred in denying his motion for an interpreter pursuant to R.C. 2311.14(A). The defendant argues in his second assignment of error that he was denied the effective assistance of counsel. In his third assignment of error, he claims that his convictions are contrary to the manifest weight of the evidence. Finally, in his fourth assignment of error, the defendant claims that the two offenses are allied offenses of similar import. See R.C. 2941.25(A). Each of these claims lack merit, so we affirm the trial court's judgment.

## I

At trial the state sought to prove that the defendant, Jhasson Saah, on the evening of June 28, 1988, deliberately set a fire in his grocery store in order to recover fire insurance proceeds on the contents of the store. The defendant leased the store space from the owner of the building.

The defendant is a Palestinian who has lived in this country since 1976. At trial he claimed that he was the victim of racial unrest between the Arab and black communities during the summer of 1988. He asserted that neighborhood blacks had harassed him and threatened to firebomb his store prior to the fire. The defendant argues that those individuals carried out their threat and were responsible for the fire at his store.

The commander of the fire department dispatch center testified for the state regarding the time when the defendant reported the fire. He testified that fire department records indicated that a caller first reported the fire from a public telephone near the store at 7:11 p.m. Another report was received at 7:14 p.m. from a phone at a nearby store. The witness testified that fire department records indicated that rescue units arrived at the scene at 7:16 p.m., approximately five minutes from the time of the initial report. A record of the conversation concerning the first report indicated that the first caller reported that "somebody threw something in the store." The caller, upon inquiry by the dispatcher, confirmed that there was a fire at the location.

A fire department lieutenant who responded to the scene testified that his hook and ladder unit was dispatched at 7:14 p.m. and that the unit arrived at the scene within three minutes. When the unit arrived, he observed through the glass windows in the storefront that dark smoke filled the store. The witness testified that he accompanied fire fighters whose task was to climb onto the store's roof in order to chop holes for the ventilation of accumulated smoke and fire. There the lieutenant observed toward the rear of the building an area where the roofing had buckled, indicating the source of the fire. The crew vented the roof in this area and released intense heat, fire, and smoke. The lieutenant opined that, based upon the buildup of smoke in the store, the damage that the fire had done to the roof, and the intensity of the fire released upon ventilation, the fire had been burning from fifteen to twenty minutes prior to his arrival.

A fire fighter who responded to the scene testified that when he arrived, his superior ordered him to investigate the rear of the store. The fire fighter testified that an eight-foot high chain link fence surrounded the rear of the building. He observed that the rear of the store contained two to three windows that had been bricked shut and also a heavy metal door. The perimeter fence contained a gate which initially appeared to be locked by a chain lock. However, the fire fighter discovered that the chain lock had been twisted around so that it merely appeared to be locked. In actuality, the lock had not been snapped shut. The fire fighter thereupon walked through the gate to the rear door. He found that that door was unlocked and that it opened inward. Upon entering the building, the fire fighter discovered the fire, approximately fifteen feet in diameter, in the center of the rear portion of the building.

The assistant fire chief who managed the fire testified that he arrived at the scene at approximately 7:20 p.m. He observed a heavy volume of smoke coming from the front windows of the store which had been broken by other fire fighters. The assistant chief testified that the volume of smoke and the intensity of the heat emanating from the front of the building prevented fire fighters from working the fire from that direction. The witness opined that, based upon the extent and the intensity of the fire, the fire had been burning for a "minimum" of fifteen to twenty minutes prior to his arrival.

The assistant chief testified that after the fire fighters had brought the fire under control, a bystander approached him and told him that black males had firebombed the store. Shortly thereafter the assistant chief spoke to the defendant. The witness testified that the defendant appeared very excited and distraught. The defendant told him that black males had come into the

store and firebombed it. He told the assistant chief that when this occurred, he had escaped out of the rear door and called the fire department.

A second fire fighter who acted as an aide to one of the fire chiefs at the scene testified that he interviewed the defendant shortly after the fire had been brought under control. He testified that the defendant told him that as he was closing the store, someone threw something through the rear door. The defendant told him that he saw "sparks" and then saw three black males who had threatened to burn his store earlier in the day running from the rear of the store. The defendant further explained to him that at the time the rear door had been open but that the rear gate had been closed. The aide testified that based upon his observations of the rear entrance, an object thrown from the rear gate through the rear door would have had to curve in order to land in the area where the fire started. The aide further estimated the damage to the store itself as amounting to $20,000 and damage to the store's contents as amounting to $5,000.

The fire department investigator assigned to the case testified that he interviewed the defendant on the evening of the fire. The defendant told him that earlier that day he had been harassed by the black female patrons at the store. Later in the afternoon four black males had come into the store and threatened him. The investigator testified that the defendant stated that immediately prior to the fire he had emptied trash in a dumpster in the back of the store. He said that he returned to the store and was standing near the cash register preparing to close the store when he noticed a small fire toward the rear of the store. The defendant further told the investigator that he saw someone in the back of the store. However, the defendant could not describe this individual.

The investigator testified that based upon his investigation of the scene, the fire had been deliberately set in the rear area of the store. He stated that he found no evidence of a firebomb, and accordingly opined that an incendiary device had not been used to start the fire. The investigator asserted that the arsonist had started the fire by igniting a flammable liquid that had been poured on the floor. The investigator testified that he examined the rear metal door and found that it had no exterior handle. He stated that an individual attempting to close that door from the outside would have had to grasp the edge of the door and in a sudden motion slam it shut. He testified that both the front and the rear doors to the store showed no signs of forced entry.

A police arson investigator who was assigned to the case also testified for the state. He testified that he interviewed the defendant shortly after the fire. The defendant claimed that someone had thrown a firebomb through

one of the store's windows. During the investigator's examination of the scene, he discovered an empty one-gallon can of paint thinner on a shelf near the rear door of the store. He further found that the telephone in the store, which was located near the front counter, was still operational, despite the fire.

The investigators seized as evidence the defendant's coat which had been found near the cash register. The police investigator testified that he later discovered in the pockets of the coat the defendant's insurance documents for the store among various other business and personal papers. The witness further testified that he found several lighters and matchbooks in the defendant's coat pockets.

A police forensic expert testified concerning the results of the analysis of various items and samples taken from the store by investigators. She determined from the residue in the can of paint thinner taken from the scene that the can contained an accelerant that was of the type "Fuel Oil No. 1." The witness explained that an accelerant is a substance used to increase the spread of fire. Fuel Oil No. 1 constitutes a class of accelerants which includes paint thinner, kerosene, and charcoal lighter fluid. The forensic specialist further testified that an analysis of a sample of burnt wood taken from the rear of the store indicated the presence of Fuel Oil No. 1.

A police patrol officer testified that at approximately 5:00 p.m. before the fire he answered a complaint concerning individuals damaging store property at the defendant's store. The defendant told the patrolman that four black males had "trashed" and threatened to burn his store. The patrolman testified that he observed no evidence in the store that this had actually occurred. He noted that the stock in the store appeared depleted to the extent that he believed the store was going out of business.

The patrolman testified that he returned to the store at 8:00 p.m. after the fire. He interviewed the defendant who told him that he had observed smoke and flames coming from the rear of the store at the time he was closing for business. The defendant told him that he attempted to call the fire department from his store but claimed that his phone did not work. The patrol officer further testified that the defendant told him that the back door and gate had been locked.

The manager of the furniture store situated next to the defendant's store testified for the prosecution. He testified that on the evening of the fire at approximately 7:10 p.m., he peered into the defendant's store and saw that the store was on fire. The manager further observed the defendant using the public telephone across the street, apparently calling the fire department. Once the defendant finished the call, he ran to the rear of his store and the

manager followed him. The witness testified that the defendant appeared to be both nervous and upset. Although the defendant complained that blacks had set his store on fire, the manager saw no one near the store. The witness further testified that in the two months preceding the fire, he observed on two occasions forty to sixty boxes being taken from the store and loaded into a van. The manager stated that he did not know the contents of those boxes.

The claims adjuster for the defendant's insurance company testified. He stated that on June 17, 1988, he visited the defendant's store in order to evaluate an insurance claim filed by the defendant for smoke damage to the contents of his store as a result of a fire in an adjoining shoe store. The claims adjuster testified that he was unable to verify any damage to the defendant's property. Several days later the claims adjuster notified the defendant that his claim would be denied. He testified that the defendant appeared upset by the denial of his claim.

A manager from the defendant's insurance company also testified. She stated that the insurance company issued an insurance policy on the store effective February 28, 1988. The policy included up to $45,000 in contents coverage. She testified that the defendant filed a claim for fire damage resulting from the June 28 fire.

The defendant testified on his own behalf. He stated that he was a Palestinian with residency status in the United States. At the time of trial, he had lived in this country for twelve years. The defendant testified that he purchased the store from a friend in October 1987. He asserted that in the seven to eight months prior to the fire his store had returned a monthly profit of approximately $2,000. In the ten days prior to the fire the defendant claimed that he had purchased and installed approximately $5,000 to $6,000 in new equipment for the store. He further asserted that on June 14 he learned that his liquor license application for the store would be approved. The defendant asserted that he expected that the sale of alcoholic beverages would make his store more profitable.

The defendant testified that prior to the fire his store had been subject to vandalism. He stated that problems with blacks in the neighborhood began after June 18 when an Arab store owner in another section of the city shot and killed a black patron. The defendant testified that several days before the fire, two black males came into his store and refused to pay for a can of sausage. An argument erupted and the men threatened him.

On the day of the fire at approximately 3:00 p.m., two black females came into his store and harassed him, threatened to take some goods without paying for them, and refused to leave the store until he threatened to call the police. Later, as he was emptying garbage behind the store, he heard a noise

from the front of the store. In hurrying to return to the store, he "snapped" the lock on the gate leading to the rear door, thinking he had locked the gate. From his front store window, he observed four black females attempting to dissuade customers from shopping at his store.

The defendant testified that some time later, four black males entered his store. He claimed that they refused to pay for soft drinks that they opened and consumed. The defendant said that they threatened to burn down his store. When he picked up the phone to call the police, they began to leave the store, smashing merchandise on the way out. The defendant claimed that he cleaned up the store before the police arrived.

After the police had left, he asked a friend to stay with him in the store until closing time so that he would be more secure. His friend left at approximately 6:45 p.m. and the defendant began to prepare the store for closing. As he was emptying the cash register, he heard a noise from the back of the store. When he looked around to see the cause of the sound, he saw flames and smoke coming from the back of the store. He then fled the building and called the fire department from a public telephone across the street.

The defendant claimed that after he made the call, he ran to the rear of the building with the manager from the adjoining store. Minutes later he made a second call from a store across the street. The defendant denied that he started the fire and denied that he hired someone else to start the fire.

The defendant called as a witness an Arab–American community leader who testified concerning the problems between the Arab and black communities during the summer of 1988. He confirmed that tensions were high at that time as a result of the shooting death of a black man by an Arab store owner.

An insurance adjuster who investigated the fire in the shoe store adjoining the defendant's store testified that while investigating that claim he stopped at the defendant's store in order to purchase a sandwich. He stated that he saw the defendant arguing with two black customers concerning a can of sausage. The witness stated that before they left the store the men threatened the defendant and told him that he was doing business in the "wrong" area.

The defendant called as witnesses three businessmen who corroborated the defendant's claim that he made substantial capital improvements in the store immediately prior to the fire. The defendant's civil attorney corroborated the defendant's claim that on June 14, the state had approved the defendant's application for a liquor license and that the state was in the process of issuing that license. Further, a photographer who took pictures of the store after the

fire on behalf of the defense testified that from the remains of the fire the store appeared to have been fairly well stocked when the fire occurred.

## II

The defendant, in his first assignment of error, complains that the trial court erred in failing to appoint an interpreter to assist in his defense. He argues that the absence of an interpreter denied him a fair trial. The defendant claims that he was unable to effectively assist defense counsel in preparation for trial and was unable to effectively communicate as a witness.

R.C. 2311.14(A) requires that a trial court appoint an interpreter where a party "cannot readily understand or communicate" as a result of some impairment. Generally, a trial court has broad discretion in determining whether a criminal defendant requires the assistance of an interpreter. See *State v. Quinones* (Oct. 14, 1982), Cuyahoga App. No. 44463, unreported, 1982 WL 5957. Accordingly, this court shall not reverse a trial court's ruling in this regard absent a showing that the trial court acted unreasonably, unconscionably, or arbitrarily. Cf. *State v. Apanovitch* (1987), 33 Ohio St.3d 19, 22, 514 N.E.2d 394, 398 ("abuse of discretion" defined).

Here, the trial court properly exercised its discretion in refusing to appoint an interpreter since the record demonstrates that the defendant has a functional mastery of the English language. The evidence reveals that the defendant has engaged in extensive business ventures in this country for a period of four years. Both prosecution and defense witnesses consistently testified that the defendant has effectively communicated with them on previous occasions. See *State v. Quinones, supra.* Moreover, the defendant's testimony at trial established that he could effectively understand English and communicate in English. Generally, the defendant had no difficulty understanding or answering the questions posed. On those occasions when the defendant had difficulty understanding a question, simple rephrasing of the question consistently remedied any misunderstanding.

Since the record fails to substantiate the alleged necessity for an interpreter, we overrule the defendant's first assignment of error.

## III

The defendant, in his second assignment of error, claims that his counsel denied him effective assistance. Specifically, he claims that his counsel failed to object to inadmissible testimony given by various witnesses at trial.

In order to obtain a new trial for ineffective assistance of counsel, the defendant must show that his counsel deprived him of a fair trial. He must

demonstrate that (1) his counsel's performance was seriously deficient, and (2) the result would probably have been different had his counsel performed competently. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693; *State v. Post* (1987), 32 Ohio St.3d 380, 388, 513 N.E.2d 754, 762.

In evaluating defense counsel's performance, a reviewing court initially presumes that duly licensed counsel performed competently. *State v. Lytle* (1976), 48 Ohio St.2d 391, 397, 2 O.O.3d 495, 498, 358 N.E.2d 623, 627. Further, a reviewing court must accord deference to counsel's strategic choices from counsel's perspective then without the benefit of hindsight. *Strickland, supra*, at 689–690, 104 S.Ct. at 2065–2066, 80 L.Ed.2d 694–695.

The defendant first argues that defense counsel should have sought the exclusion of certain statements by the police patrolman who responded to the complaint of harassment earlier in the day of the fire and the insurance claims adjuster who had examined the store for smoke damage eleven days earlier. The patrolman testified that when he left the store after investigating the complaint, he believed that, despite the defendant's claims that some black males had threatened to firebomb his store, the defendant intended to fire-bomb his own store. The claims adjuster testified that he believed prior to the fire at the defendant's store that the defendant would possibly seek revenge against the insurance company for denying his earlier claim.

Evid. R. 701 requires that lay opinion testimony be limited to opinions or inferences "rationally based upon the perception of the witness." We agree with the defendant that the statements made by the police patrol-man and the claims adjuster were not rationally based upon their perception. Accordingly, defense counsel had reasonable grounds to seek the exclusion of this clearly prejudicial testimony. However, in light of the ample circumstantial evidence supporting the defendant's conviction, we cannot conclude with reasonable certainty that the exclusion of this evidence would have resulted in acquittal. Accordingly, the defendant cannot obtain a new trial for ineffective assistance of counsel based upon this ground.

The defendant further complains that defense counsel failed to object to or elicited a variety of other prejudicial statements made by various witnesses at trial. Our review of the record discloses that these statements either (1) constituted admissible relevant evidence; (2) were elicited by the prosecution as proper subjects of cross-examination; or (3) were elicited by defense counsel within the purview of arguably plausible defense strategy. Moreover,

there exists no reasonable probability that the exclusion of these statements would have altered the outcome of trial.

Accordingly, we overrule the defendant's second assignment of error.

## IV

The defendant, in his third assignment of error, challenges the weight of the evidence supporting his convictions.

■ Generally, the credibility of witnesses and the weight of the evidence are matters for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. Accordingly, a reviewing court shall affirm a criminal conviction where competent, credible evidence supports that conviction. *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, syllabus.

In this case, the jury convicted the defendant for arson of another's property and arson with purpose to defraud. R.C. 2909.03(A) defines those offenses:

"No person, by means of fire or explosion, shall knowingly:

"(1) Cause, or create a substantial risk of, physical harm to any property of another without his consent;

"(2) Cause, or create a substantial risk of, physical harm to any property of himself or another with purpose to defraud[.]"

■ In this case, the defendant's conviction is based upon circumstantial evidence. A defendant may be convicted solely on the basis of circumstantial evidence. *State v. Nicely* (1988), 39 Ohio St.3d 147, 151, 529 N.E.2d 1236, 1239. However, where the state relies upon circumstantial evidence alone to convict a defendant, the evidence must be consistent solely with guilt and irreconcilable with any reasonable theory of innocence. *Id.* Generally, the trier of fact determines the reasonableness of an alternative theory of innocence. *State v. Cousin* (1982), 5 Ohio App.3d 32, 37, 5 OBR 34, 40, 449 N.E.2d 32, 38. Further, the trier of fact may reject a theory of innocence based upon testimony which lacks credibility. *Id.*

■ Here, the jury could reasonably reject the defendant's claim that others set fire to his store. At trial, he testified that he merely heard a noise and turned to see the fire beginning in the rear area of the store. The defendant's credibility in this regard could reasonably be questioned since several prosecution witnesses testified that the defendant told them more detailed and conflicting accounts immediately following the fire. Moreover, evidence concerning the condition of the two rear doors and the rear gate to

the store belies the proposition implicit in the defendant's story that an arsonist had entered and exited the rear of the store.

Ample circumstantial evidence identifies the defendant as the arsonist. The evidence indicates that prior to the fire the defendant removed stock from the store in anticipation of a fire. The police officer who answered the defendant's complaint prior to the fire testified that he observed no evidence substantiating the defendant's claim that he had been harassed by neighborhood blacks.

Moreover, the jury could reasonably conclude from the evidence that (1) the defendant's paint thinner had been used to start the fire; (2) the defendant had failed to immediately report the fire; and (3) the defendant had taken special precautions to protect his insurance documents from the fire. The evidence reasonably supports the jury's conclusion that the defendant committed arson.

Accordingly, we overrule the defendant's third assignment of error.

## V

The defendant, in his fourth assignment of error, argues that he cannot be convicted of both arson of another's property and arson with purpose to defraud since those offenses constitute allied offenses of similar import. See R.C. 2941.25(A).

"Under R.C. 2941.25, a two-tiered test must be undertaken to determine whether two or more crimes are allied offenses of similar import. In the first step, the elements of the two crimes are compared. If the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must then proceed to the second step. In the second step, the defendant's *conduct* is reviewed to determine whether the defendant can be convicted of both offenses. If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses. * * * *" (Emphasis *sic.*) *Newark v. Vazirani* (1990), 48 Ohio St.3d 81, 549 N.E.2d 520, syllabus.

Comparing the elements of the two crimes charged in the instant action, we find that the elements do not correspond to such a degree that the commission of one results in the commission of the other. Under R.C. 2909.03(A)(1), a conviction for arson necessarily requires proof that the defendant caused or attempted to cause damage to another's property without that individual's consent. However, causing damage to any person's property, including one's own property, *with purpose to defraud* constitutes the distinguishing element of an arson offense under R.C. 2909.03(A)(2). Accordingly, these are not

allied offenses of similar import. Having reached this determination, we need not proceed to the second step of the analysis since the second step only applies where the offenses have been determined to be allied. *State v. Mughni* (1987), 33 Ohio St.3d 65, 68, 514 N.E.2d 870, 873.

We overrule the defendant's fourth assignment of error and affirm his convictions.

*Judgment affirmed.*

FRANCIS E. SWEENEY, P.J., and GRADY, J., concur.

THOMAS J. GRADY, J., of the Second Appellate District, sitting by assignment.