[Cite as *State v. Valiente-Mendoza*, 2018-Ohio-3090.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
WOOD COUNTY

State of Ohio                                            Court of Appeals No. WD-16-067

    Appellee                                            Trial Court No. 2016CR432

v.

Juan Valiente-Mendoza                          **DECISION AND JUDGMENT**

    Appellant                                            Decided:  August 3, 2018

* * * * *

Paul A. Dobson, Wood County Prosecuting Attorney, David T.
Harold and Channa B. Beard, Assistant Prosecuting Attorneys,
for appellee.

Lawrence A. Gold, for appellant.

* * * * *

**OSOWIK, J.**

## I.  Introduction

{¶ 1} Appellant, Juan Valiente-Mendoza, appeals the judgment of the Wood

County Court of Common Pleas, sentencing him to 14 years in prison following a jury

trial in which he was found guilty of one count each of possession of heroin, trafficking

in heroin, possession of drugs, and trafficking in drugs.  Finding no error, we affirm.

## A. Facts and Procedural Background

**{¶ 2}** On the morning of September 1, 2016, Ohio State Highway Patrol Trooper Ryan Stewart and Border Patrol Agent Matthew Siefert were parked in a crossover along the Ohio Turnpike in Wood County when they observed a white Chevrolet Suburban SUV traveling eastbound. The vehicle was being driven by appellant, who appeared to the officers to be unusually rigid in posture.

**{¶ 3}** Suspecting that something may be afoot with respect to appellant, Stewart decided to pull out of the crossover and observe appellant. As the officers approached the Suburban, they noticed that appellant had switched from the left lane to the right lane of travel, and was operating the vehicle with his hazard lights flashing. Stewart drew near to the vehicle in an effort to ascertain the license plate number and run the vehicle's registration. The officers noticed that the license plates were from California. As Stewart was looking at the license plate in order to take down the number, appellant abruptly pulled his vehicle onto the shoulder and stopped. The officers slowed down and pulled onto the shoulder about three-quarters of a mile ahead of appellant and began to observe the Suburban. Appellant had already pulled off of the shoulder and back onto the highway by the time Stewart stopped his marked cruiser. In Stewart's estimation, it appeared as though appellant's behavior was evasive. Consequently, the officers decided to continue to monitor appellant.

**{¶ 4}** After pulling back onto the highway, appellant proceeded to the next exit, which was located between where he originally stopped and where the officers had pulled

2.

onto the shoulder. Stewart then waited for traffic to clear and proceeded onto a crossover and eventually onto the exit ramp. As the officers approached the tollgate, they noticed that the Suburban's hazard lights were still activated. The officers also noticed that there was a female passenger, Ms. Alvarado-Franco, in the back seat, later identified as the owner of the Suburban. Steward proceeded to a tollgate lane adjacent to the one selected by appellant, where he was able to obtain a license plate number. While the registration was being ascertained, the officers noticed a stroller in the back of the vehicle, which appeared strange to Stewart since there were no small children in the vehicle.

{¶ 5} After appellant cleared the tollgate, he immediately pulled to the shoulder of the toll area and stopped. Stewart proceeded past appellant and pulled his cruiser over. Meanwhile, appellant exited the Suburban, opened the hood, and began to look around the engine compartment as though he was experiencing mechanical problems with the vehicle. Observing appellant's behavior, Stewart reversed his cruiser so that he could pull behind the Suburban and assist appellant. Stewart then parked his cruiser and activated his rear lights.

{¶ 6} Upon exiting the cruiser and approaching the Suburban, Stewart noticed that Alvarado-Franco had made her way into the driver's seat. Stewart also noticed that there were no children in the vehicle despite the presence of a stroller. Stewart inquired about the condition of the Suburban, and appellant informed him that the vehicle was shaking, possibly due to an issue with the brakes. Given his mechanical understanding, Stewart found it odd that appellant would examine the engine compartment to discover a potential

3.

issue with the vehicle's brakes. In Stewart's experience, brake issues are generally discovered upon inspecting the backside of the vehicle's wheels.

{¶ 7} Upon glancing under the hood of the Suburban, Stewart noticed an aluminum canister attached to the inside of the engine compartment with masking tape and wires leading to the vehicle's battery. Stewart asked appellant about the canister, and appellant informed Stewart that it was for the battery. This piqued Stewart's suspicion because, in his experience, drug traffickers occasionally hollow out a vehicle's factory battery in order to conceal contraband inside. In such situations, a smaller battery is affixed to the engine compartment in order to power the vehicle.

{¶ 8} As Stewart was talking with appellant, he noticed that Alvarado-Franco was attempting to start the vehicle. On her second attempt, Alvarado-Franco abruptly turned the vehicle off as the engine was starting to turn over, in what appeared to Stewart to be an attempt to prevent the vehicle from starting.

{¶ 9} In light of the suspicious behavior Stewart had observed up to this point, Stewart asked appellant to see his identification. Appellant ultimately produced identification materials issued by the Mexican consulate.

{¶ 10} Thereafter, Stewart asked appellant about his ultimate destination. With some hesitation, appellant informed Stewart that he was traveling to New York for one to two weeks on vacation. Stewart inquired as to whether appellant had any children, to which appellant responded that he had two adult daughters.

4.

**{¶ 11}** Meanwhile, Siefert had reached into the Suburban and started the vehicle for Alvarado-Franco. Siefert then engaged Alvarado-Franco in a conversation, during which Alvarado-Franco appeared "fidgety – a sign of nervousness – like she seemed to have a hard time sitting still." Alvarado-Franco informed Siefert that she was traveling to New York for four or five days. As was the case with appellant, Alvarado-Franco produced identification from the Mexican consulate.

**{¶ 12}** Given the suspicious activity from appellant and Alvarado-Franco, and in light of the conflicting lengths of stay that the two provided to Stewart and Siefert, Stewart called for the assistance of a canine unit. While waiting for the unit to arrive, Stewart conducted a criminal history check and Siefert conducted an immigration inspection. A canine sniff was ultimately performed, but the dog did not give a trained final response indicating the presence of narcotics.

**{¶ 13}** After concluding his immigration inspection, Siefert approached appellant and reintroduced himself as a border patrol agent. During the conversation that ensued, appellant informed Siefert that he was in the United States illegally. Siefert then informed appellant that the consequences for his being in the country illegally would range from jail-time to being released depending upon his criminal and immigration history.

**{¶ 14}** Two to three minutes into Siefert's conversation with appellant, Siefert asked appellant for consent to search the Suburban. Appellant consented, and Siefert explained that he would be searching the entire vehicle including the engine

5.

compartment, to which Appellant again provided his consent. Siefert then sought Alvarado-Franco's consent to search the vehicle. Because she did not appear to be as fluent in English as appellant, Siefert asked Alvarado-Franco if he could search the vehicle in Spanish. She consented.

{¶ 15} Appellant and Alvarado-Franco were escorted to Stewart's cruiser for officer safety, where they remained during the duration of the search. According to Siefert, a border patrol agent remained by their side during the search in case they decided to withdraw consent. As Stewart was searching the Suburban, Siefert continued his immigration inspection. Eventually, Siefert discovered that appellant had been previously deported on five or six occasions.

{¶ 16} Stewart and another trooper conducted a search of the Suburban. During the search, Stewart noticed "a lot of tampering marks or tooling marks on the rear seat as well as the gas tank area." The gas tank appeared to have recently been removed. Upon further investigation, Stewart found a pry mark on the edge of an interior piece of molding covering the driver's side rear wheel well. Stewart removed the piece of molding to discover a package that was wrapped with the same type of masking tape Stewart observed on the canister attached to the engine compartment. The package was then opened, revealing a large quantity of what appeared to be heroin, as well as a package of pills.

{¶ 17} A roadside analysis was performed on the substance, and it was confirmed to be heroin. A more thorough search was then conducted, revealing four more packages

6.

of pills.  By the time the search of the vehicle was complete, the officers had seized 503.5 grams of heroin and 3123.87 grams of Tramadol, a schedule IV controlled substance.

{¶ 18} As a result of the foregoing, appellant was indicted on September 8, 2016, and charged with one count of possession of heroin in violation of R.C. 2925.11(A) and (C)(6)(f), one count of trafficking in heroin in violation of R.C. 2925.03(A)(2) and (C)(6)(g), one count of aggravated possession of drugs in violation of R.C. 2925.11(A) and (C)(1)(e), and one count of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(2) and (C)(1)(f).  Each of these charges were felonies of the first degree to which major drug offender specifications under R.C. 2941.1410(A) were attached.

{¶ 19} On September 21, 2016, appellant appeared before the trial court for arraignment.  Appellant was found to be indigent and, because his primary language is Spanish, he was appointed an attorney who is fluent in Spanish.  Thereafter, appellant entered pleas of not guilty to the above-referenced charges.

{¶ 20} One month later, the state amended its indictment and reduced its charge in Counts 3 and 4, possession of drugs and trafficking in drugs, respectively, from first-degree felonies to second-degree felonies.  The state also removed the major drug offender specifications from Counts 3 and 4.

{¶ 21} Following pretrial discovery, appellant filed a motion to allocate additional interpreters for trial pursuant to Sup.R. 88.  In the motion, appellant requested "at least two Spanish interpreters * * * for the duration of the two-day jury trial."

7.

{¶ 22} Three days later, on November 7, 2016, appellant filed a motion to suppress, in which he argued that the narcotics that were seized following the search of the Chevrolet Suburban were only discovered after law enforcement engaged in an investigative stop without reasonable suspicion. According to appellant, the encounter amounted to a "fishing expedition" in that its duration exceeded beyond the point at which the officers had ensured the safety of appellant and Alvarado-Franco. According to appellant, the encounter should have ended once Stewart saw that the Suburban was still running.

{¶ 23} A hearing on appellant's motion to suppress was held on November 16, 2016. At the hearing, the state elicited testimony from Stewart and Siefert, and appellant took the stand to support his motion to suppress. At the conclusion of the hearing, the trial court denied the motion to suppress after finding that appellant was not stopped by Stewart and Siefert, and concluding that the ensuing search was the product of appellant's consent that had been intelligently, freely, and voluntarily given. Appellant's two-day jury trial commenced immediately thereafter.

{¶ 24} During its case-in-chief, the state recalled Stewart and Siefert. Additionally, the state called a criminalist for the State Highway Patrol Crime Lab, Jacqueline Smith. Smith was the individual responsible for analyzing the narcotics that were seized from the Suburban. During her testimony, Smith confirmed the weight of the heroin and Tramadol.

8.

{¶ 25} After presenting the foregoing evidence, the state rested. Appellant proceeded to move the trial court for an acquittal under Crim.R. 29, which the trial court denied. Appellant then rested without presenting any witnesses.

{¶ 26} Following deliberations, the jury returned a verdict of guilty on all four counts contained in the indictment, as well as a finding in favor of the major drug offender specification under Count 2. The trial court then proceeded immediately to sentencing.

{¶ 27} During sentencing, the court merged Counts 1 and 2, and also merged Counts 3 and 4. The state elected to proceed to sentencing on Counts 2 and 4. The court imposed a prison term of 11 years as to Count 2, which was mandatory on account of the major drug offender specification, and three years as to Count 4. The court ordered the prison sentences served consecutively, and also ordered appellant to pay a mandatory fine of $10,000 plus "the costs of prosecution."

## B. Assignments of Error

{¶ 28} Appellant has filed a timely notice of appeal from the trial court's judgment, assigning the following errors for our review:

I. The trial court violated Appellant's constitutional right to be free from an unlawful search and seizure in denying his motion to suppress.

II. Appellant received ineffective assistance of counsel in violation of his rights under the Sixth and Fourteenth Amendments to the United

9.

States Constitution and Article I, § 10 of the Constitution of the State of Ohio.

III. The trial court violated Appellant's right to due process by denying his right to a qualified interpreter.

IV. The trial court erred to the prejudice of Appellant in denying his Crim.R. 29 motion.

V. The jury's verdict was against the manifest weight of the evidence.

VI. The trial court committed error to the prejudice of Appellant by imposing the costs of prosecution without consideration of Appellant's present or future ability to pay.

## II. Analysis

### A. Motion to Suppress

{¶ 29} In his first assignment of error, appellant argues that the trial court erred in denying his motion to suppress.

{¶ 30} "Appellate review of a motion to suppress presents mixed questions of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact." *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100. The appellate court must accept the trial court's findings of fact if supported by competent, credible evidence. *State v. Steed*, 2016-Ohio-8088, 75 N.E.3d 816, ¶ 11 (6th

Dist.).  A de novo standard applies to determine if the facts satisfy the applicable legal standard.  *State v. Bragg*, 6th Dist. Lucas No. L-07-1162, 2007-Ohio-5993, ¶ 4.

{¶ 31} "The Fourth Amendment to the United States Constitution and the Ohio Constitution, Article I, Section 14, prohibit unreasonable searches and seizures."  *State v. Emerson*, 134 Ohio St.3d 191, 2012-Ohio-5047, 981 N.E.2d 787, ¶ 15.  When a police officer stops a vehicle and detains its occupants, a seizure within the meaning of those provisions has occurred.  *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979).

{¶ 32} The Supreme Court of the United States has identified three categories of police-citizen interactions:  (1) a consensual encounter, which requires no objective suspicion and does not implicate the Fourth Amendment; (2) a brief, investigatory detention or stop, which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) an arrest, which must be supported by probable cause.  *Florida v. Royer*, 460 U.S. 491, 501-507, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Mendenhall*, 446 U.S. 544, 553, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980).  Reasonable suspicion constitutes something less than probable cause.  *State v. Carlson*, 102 Ohio App.3d 585, 590, 657 N.E.2d 591 (9th Dist.1995).  The propriety of an investigative stop must be viewed in light of the totality of the circumstances.  *State v. Bobo*, 37 Ohio St.3d 177, 524 N.E.2d 489 (1988), paragraph one of the syllabus.

{¶ 33} Here, appellant asserts that "both the stop and prolonged detention of the vehicle he was driving were undertaken without reasonable suspicion or probable cause."

11.

Notably, appellant was not stopped by Stewart. Rather, Stewart and Siefert engaged appellant after he abruptly pulled his vehicle onto the shoulder of the road, got out of the vehicle, and began to look into the engine compartment as if there was a mechanical issue with the vehicle.

> Police officers without reasonable suspicion of criminal activity are allowed to intrude on a person's privacy to carry out "community caretaking functions" to enhance public safety. The key to such permissible police action is the reasonableness required by the Fourth Amendment. When approaching a vehicle for safety reasons, the police officer must be able to point to reasonable, articulable facts upon which to base her safety concerns. *State v. Norman*, 136 Ohio App.3d 46, 54, 735 N.E.2d 953 (3d Dist.1999).

{¶ 34} Given appellant's erratic driving, the use of his hazard lights as he was driving along the highway, the fact that he pulled onto the shoulder on two occasions in a short time period, and his examination of the engine compartment while on the shoulder, we find that Stewart and Siefert acted reasonably when they approached appellant to provide assistance. This initial interaction between the officers and appellant amounted to a consensual encounter, which required no suspicion of criminal activity.

{¶ 35} After approaching appellant to see if he needed assistance, Stewart made several observations that, when taken in their totality, created in Stewart an articulable and reasonable suspicion that appellant was engaged in drug trafficking sufficient to

12.

justify extending the encounter. Specifically, Stewart observed that there were no children in the vehicle despite the presence of a stroller, which Stewart indicated at trial was a common tactic employed by drug traffickers to deceive law enforcement officers. Stewart also noticed a canister attached inside the engine compartment using masking tape. Stewart testified during the suppression hearing that drug traffickers oftentimes utilize such devices as replacements for the car battery, which can then be hollowed out and used to hide contraband. Alvarado-Franco purposefully preventing the Suburban from starting, along with her nervous demeanor after Siefert started the vehicle, provided further support for Stewart's suspicion of criminal activity. Also relevant in this inquiry is the inconsistency between appellant and Alvarado-Franco concerning the amount of time they were planning on spending in New York.

{¶ 36} Taken together, the foregoing observations provided Stewart and Siefert with the reasonable suspicion necessary to extend the encounter in order to perform a canine sniff and an immigration inspection. Following the immigration inspection, it was determined that appellant was in the country illegally and had been previously deported several times. Thereafter, the officers asked both appellant and Alvarado-Franco for their consent to search the vehicle. Both individuals consented.

{¶ 37} The state bears the burden of proving that consent to a search without a warrant was freely and voluntarily given. *Royer*, *supra*, 460 U.S. at 497, 103 S.Ct.1319, 75 L.Ed.2d 229; *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). "[T]he question whether a consent to search was in fact 'voluntary'

13.

or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth* at 227.

{¶ 38} Appellant insists that his consent was not freely and voluntarily given because he is not fluent in English. In support of his contention, appellant points to the fact that he required two interpreters during trial. We find no merit to this argument. The record demonstrates that Stewart conversed with appellant in English during the entire encounter with no difficulty. There is no indication that appellant failed to understand the questions he was being asked by Stewart. Furthermore, there is no evidence to establish that the consent obtained by the officers in this case was the product of coercion or duress.

{¶ 39} Upon consideration of the totality of the circumstances in this case, we find that the trial court properly concluded that Stewart's encounter with appellant, and his subsequent consensual search of the Suburban, did not violate the Fourth Amendment's protections against unreasonable searches and seizures. Thus, we find that the trial court properly denied the motion to suppress.

{¶ 40} Accordingly, appellant's first assignment of error is not well-taken.

### B. Ineffective Assistance of Counsel

{¶ 41} In his second assignment of error, appellant argues that he received ineffective assistance from his trial counsel.

{¶ 42} In order to demonstrate ineffective assistance of counsel, appellant must satisfy the two-prong test developed in *Strickland v. Washington*, 466 U.S. 668, 687, 104

S.Ct. 2052, 80 L.Ed.2d 674 (1984).  That is, appellant must show that counsel's performance fell below an objective standard of reasonableness, and a reasonable probability exists that, but for counsel's error, the result of the proceedings would have been different.  *Id.* at 687-688, 694.

{¶ 43} Here, appellant contends that counsel was ineffective for rejecting a plea offer that he had previously elected to accept.  This argument is not supported by the record.

{¶ 44} According to the transcript of the proceedings, the state made two alternative plea offers, and stated them for the record prior to the suppression hearing. Under the first option, the state offered to amend Counts 3 and 4 to felonies of the second degree, with sentencing parameters that would be more favorable to appellant.  Further, the state would recommend the sentences be run concurrent to one another for an aggregate prison term of 11 years.  Under the second option, the state would amend Counts 3 and 4 as outlined in the first option, and the major drug offender specifications under Counts 1 and 2 would be dismissed.  Sentencing would be postponed and appellant would be given an opportunity to cooperate with law enforcement, which would impact the state's subsequent sentencing recommendation.

{¶ 45} After reciting the foregoing options, the following colloquy took place:

THE COURT:  All right.  Understanding that, does he wish to accept either offer from the State?

THE DEFENDANT:  (Through Interpreter) Yes, Your Honor.

15.

THE COURT: I am sorry?

THE DEFENDANT: (Through Interpreter) Yes, Your Honor.

THE COURT: He does wish to accept one of those offers?

THE DEFENDANT: (Through Interpreter) Yes. Yes, 1, 2, and 3 and 4 you say?

[DEFENSE COUNSEL]: He clearly does not understand.

THE COURT: There were two offers: A and B, all right?

THE DEFENDANT: (Through Interpreter) Yes.

THE COURT: What I am asking is, does he wish to accept one of those offers?

THE DEFENDANT: (Through Interpreter) B.

[DEFENSE COUNSEL]: Your Honor, I need private consultation with my client.

THE COURT: All right, let's do it, please. We are late starting our suppression hearing.

{¶ 46} After consulting with her client, defense counsel reiterated the plea offers on the record, and appellant once again indicated his desire to accept the second option and cooperate with law enforcement. During this process, defense counsel, who is fluent in Spanish, became concerned that the interpreter was not accurately interpreting appellant's wishes. Consequently, another interpreter, Mr. Moore, was called upon to interpret the proceedings. Moore confirmed that appellant wished to accept the state's

16.

second plea offer.  A brief recess was taken in order to allow appellant to review and execute the plea agreement.  After returning from the recess, the court engaged appellant as follows:

THE COURT:  Be seated.  Mr. Mendoza, before we took that break, you indicated to me that you wished to accept the B offer from the State of Ohio.  Now, I am being told that you do not wish to accept that?

THE DEFENDANT:  (Through Interpreter) Yes, that's correct.

THE COURT:  And, again, just to make sure you understand so the record is clear, the current charges you face have a possible 19 year prison sentence.  With Offer B, you face a maximum of an 11 year prison sentence and, depending upon your cooperation, it could be much less than that, do you understand that?

THE DEFENDANT:  (Through Interpreter) Yes.

THE COURT:  All right.  And you are rejecting both offers, is that correct?

THE DEFENDANT:  (Through Interpreter) Yes.

{¶ 47} Upon consideration of the foregoing, we find that appellant's trial counsel did not reject the state's plea offer.  Rather, it appears that appellant, upon further reflection, decided not to proceed with the plea agreement.  Appellant acknowledges this in his brief, but complains that the trial court failed to question him when he rejected the state's offers to ensure that he knowingly rejected the offers.  This argument fails,

17.

because the trial court was not required to ensure appellant knowingly rejected the plea offer. *State v. Hills*, 8th Dist. Cuyahoga No. 98848, 2013-Ohio-2902, ¶ 18 ("Although Crim.R. 11 places an obligation on the court to inform a defendant that a guilty plea waives certain constitutional rights, the court has no duty to inform a defendant of the consequences of rejecting a plea.").

{¶ 48} Because appellant, rather than defense counsel, rejected the state's plea offers after a full explanation of their terms, we find no merit to his ineffective assistance of counsel argument. Accordingly, appellant's second assignment of error is not well-taken.

### C. Qualified Interpreter

{¶ 49} In his third assignment of error, appellant contends that the trial court erred by denying his right to a qualified interpreter.

{¶ 50} Regarding the appointment of an interpreter, R.C. 2311.14(A)(1) provides: "Whenever because of a hearing, speech or other impairment a party to or witness in a legal proceeding cannot readily understand or communicate, the court shall appoint a qualified interpreter to assist such person." Likewise, Sup.R. 88(A)(1) requires the appointment of a foreign language interpreter when "[a] party or witness who is limited English proficient or non-English speaking requests a foreign language interpreter and the court determines the services of the interpreter are necessary for the meaningful participation of the party or witness." Further, Sup.R. 88(F)(1) mandates the appointment of two or more foreign language interpreters when the case or court function will last

18.

more two or more hours and requires continuous, simultaneous, or consecutive interpretation.

{¶ 51} The decision to appoint a translator, whether to assist a witness or a defendant, is within the trial court's sound discretion. *State v. Mota*, 6th Dist. L-04-1354, 2006-Ohio-3800, ¶ 23; *State v. Saah*, 67 Ohio App.3d 86, 95, 585 N.E.2d 999 (8th Dist.1990). An appellate court will not upset the decision of the trial court regarding the need for an interpreter absent an abuse of discretion. *Id.* An abuse of discretion connotes that the court's attitude was arbitrary, unreasonable or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 52} In the present case, appellant acknowledges that the trial court appointed two interpreters, Mr. Zuniga and Mr. Moore, in this case. However, he asserts that Zuniga was not a *qualified* interpreter, as required by R.C. 2311.14(A)(1). The record belies this assertion.

{¶ 53} Regarding the qualification of interpreters, Sup.R. 88(D) outlines what has been described as a "hierarchy for preferred interpreter candidates." *State v. Gaspareno*, 2016-Ohio-990, 61 N.E.3d 550, ¶ 63 (3d Dist.). At the top of the hierarchy, the rule provides for the appointment of "a Supreme Court certified foreign language interpreter to participate in-person at the case or court function." Sup.R. 88(D)(1). When a Supreme Court certified interpreter is unavailable or nonexistent, a court may appoint a provisionally qualified foreign language interpreter. Sup.R. 88(D)(2). If no such provisionally qualified foreign language interpreter is available, a court may appoint a

19.

language-skilled foreign language interpreter. Sup.R. 88(D)(3). Finally, if none of the foregoing types of interpreters are available, a court may appoint an interpreter to participate in the case or court function through telephonic interpretation. Sup.R. 88(D)(4).

{¶ 54} Prior to the suppression hearing and jury trial, the trial court administered an oath to Zuniga and examined Zuniga's qualifications. The court began by asking Zuniga about his experience in interpreting in courts. Zuniga explained that he had acted as an interpreter in courts in Toledo, as well as in hospitals, schools, and businesses, through the International Institute. The court then asked Zuniga if he was certified by the Ohio Supreme Court. Zuniga responded in the affirmative. The record also confirms that Moore was certified by the Ohio Supreme Court.

{¶ 55} Upon examination of the record, it is clear that the interpreters appointed in this case were not only qualified, but were actually Supreme Court certified as required under Sup.R. 88(D)(1). Given the trial court's appointment of two Supreme Court qualified foreign language interpreters, we find no merit to appellant's contention that the trial court failed to appoint qualified interpreters.

{¶ 56} Accordingly, appellant's third assignment of error is not well-taken.

### D. Crim.R. 29 and Manifest Weight

{¶ 57} In his fourth assignment of error, appellant argues that the trial court erred in denying his Crim.R. 29 motion at the close of the state's case-in-chief. In his fifth

20.

assignment of error, appellant argues that the jury's verdict was against the manifest weight of the evidence.

{¶ 58} A motion for acquittal under Crim.R. 29(A) is a challenge to the sufficiency of the evidence. *See State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 39. The denial of a motion for acquittal under Crim.R. 29(A) "is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence." *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 59} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, the appellate court will not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 60} When reviewing a manifest weight of the evidence issue, we sit as a "thirteenth juror." *Id.* at 387. That is, we review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. *Id.* Our role is to determine "whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its

21.

way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* We reverse a conviction on manifest weight grounds for only the most "exceptional case in which the evidence weighs heavily against the conviction." *Id.* at 387.

{¶ 61} Here, appellant was convicted of one count of possession of heroin in violation of R.C. 2925.11(A) and (C)(6)(f), one count of trafficking in heroin in violation of R.C. 2925.03(A)(2) and (C)(6)(g), one count of aggravated possession of drugs in violation of R.C. 2925.11(A) and (C)(2)(c), and one count of aggravated trafficking in drugs in violation of R.C. 2925.03(A)(2) and (C)(2)(d). R.C. 2925.11(A) provides: "No person shall knowingly obtain, possess, or use a controlled substance or a controlled substance analog." R.C. 2925.03(A)(2) states:

> (A) No person shall knowingly do any of the following:
>
> * * *
>
> (2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

{¶ 62} Appellant does not dispute the sufficiency of the state's evidence with respect to the presence of controlled substances (heroin and Tramadol) in the Chevrolet Suburban he was driving at the time of his encounter with Stewart and Siefert. Instead,

22.

appellant maintains that the state failed to introduce sufficient evidence to demonstrate that he *knowingly* possessed and distributed such substances. Appellant contends that he was simply the driver of the vehicle, which was registered to Alvarado-Franco, and that he had no knowledge of the drugs that were hidden inside the vehicle.

{¶ 63} Under R.C. 2901.22(B),

A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

{¶ 64} "'Possess' or 'possession' means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is found." R.C. 2925.01(K). A court must look at all of the attendant facts and circumstances in order to determine if a defendant knowingly possessed a controlled substance. *State v. Pippen*, 8th Dist. Cuyahoga No. 81630, 2003-Ohio-1736, ¶ 8.

{¶ 65} Possession may be actual or constructive. *State v. Fykes*, 6th Dist. Wood No. WD-07-072, 2009-Ohio-2926, ¶ 36, citing *State v. Kingsland*, 177 Ohio App.3d 655,

23.

2008-Ohio-4148, 895 N.E.2d 633, ¶ 13 (4th Dist.). Actual possession occurs when the defendant has the items within his immediate physical control, whereas constructive possession occurs when the defendant is able to exercise dominion and control over an item, even if the individual does not have the item within his immediate physical possession. *Id.* "In order for constructive possession to exist, there must be evidence demonstrating that the defendant was conscious of the presence of the object. Although a defendant's mere proximity to an item is in itself insufficient to establish constructive possession, proximity to the item may constitute some evidence of constructive possession." *Id.*

{¶ 66} Here, the state introduced evidence that demonstrated appellant's constructive possession of the drugs discovered in the Suburban. The drugs were discovered in close proximity to appellant. Further, the interaction between appellant and the officers in this case was fraught with attempts to deceive the officers and evade detection of criminal activity, which demonstrated the fact that appellant was conscious of the presence of the drugs in the vehicle. Initially, appellant attempted to convince Stewart that his vehicle was not operating properly by abruptly pulling onto the shoulder of the highway. Then, when Stewart approached appellant's vehicle, he was provided conflicting stories as to where appellant and Alvarado-Franco were traveling. Meanwhile, Alvarado-Franco was attempting to continue the false narrative of a mechanical issue by turning the engine over but turning the key back in the ignition before the engine could start.

24.

{¶ 67} Given the foregoing evidence, we find that a rational trier of fact could have found that appellant was conscious of the drugs hidden inside the Suburban. Thus, we find that there was sufficient evidence that appellant knowingly possessed the drugs. Further, because we do not find that this is the exceptional case in which the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered, we find that the jury's verdict was not against the manifest weight of the evidence.

{¶ 68} Accordingly, appellant's fourth and fifth assignments of error are not well-taken.

### E.  Costs

{¶ 69} In his sixth assignment of error, appellant argues that the trial court erred by imposing the costs of prosecution without consideration of his present or future ability to pay.

{¶ 70} R.C. 2947.23(A)(1)(a) provides, "In all criminal cases * * * the judge or magistrate shall include in the sentence the costs of prosecution, including any costs under section 2947.231 of the Revised Code, and render a judgment against the defendant for such costs." This section "requires a sentencing court to impose the costs of prosecution against all convicted defendants." *State v. Wright*, 6th Dist. Wood No. WD-11-079, 2013-Ohio-1273, ¶ 5, citing *State v. White*, 103 Ohio St.3d 580, 2004-Ohio-5989, 817 N.E.2d 393, ¶ 8. Because the imposition of costs pursuant to R.C. 2947.23 is mandatory, this court has held that "[t]he trial court is not required to hold a hearing or

25.

otherwise determine an offender's ability to pay before ordering him to pay such costs." *State v. Riegsecker*, 6th Dist. Fulton No. F-03-022, 2004-Ohio-3808, ¶ 10. Therefore, we hold that the trial court did not err by ordering appellant to pay the costs of prosecution without first determining his ability to pay.

{¶ 71} Appellant also states that the trial court erred in ordering him to pay appointed counsel fees and the costs of confinement without first determining his ability to pay such costs. In its sentencing entry, the trial court merely ordered appellant to "pay the costs of this prosecution." Because the trial court did not order appellant to pay appointed counsel fees and the costs of confinement, appellant's argument as to those costs is misplaced.

{¶ 72} Accordingly, appellant's sixth assignment of error is not well-taken.

### III. Conclusion

{¶ 73} For the foregoing reasons, the judgment of the Wood County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J. _____

_____
JUDGE

Thomas J. Osowik, J. _____

_____

James D. Jensen, J. _____
CONCUR.

JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of
Ohio's Reporter of Decisions.  Parties interested in viewing the final reported
version are advised to visit the Ohio Supreme Court's web site at:
http://www.supremecourt.ohio.gov/ROD/docs/.