[Cite as *State v. Chaney*, 2023-Ohio-8.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. Earle E. Wise, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2021 CA 00139 |
| STEVEN CHANEY | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |


CHARACTER OF PROCEEDING:     Criminal appeal from the Stark County
                             Court of Common Pleas, Case No. 2021
                             CR 983


JUDGMENT:                    Affirmed


DATE OF JUDGMENT ENTRY:      January 4, 2023

APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

KYLE L. STONE                             AARON KOVALCHIK
Stark County Prosecutor                   116 Cleveland Ave. N.W., Ste 808
BY: LISA A. NEMES                         Canton, OH 44702
Assistant Prosecutor
110 Central Plaza South, Ste. 510
Canton, OH  44702

*Gwin, J.,*

{¶1} Defendant-appellant Steven Ray Chaney ["Chaney"] appeals his convictions and sentences after a jury trial in the Stark County Court of Common Pleas.

*Facts and Procedural History*

{¶2} On June 2, 2021, Chaney was indicted on the charges of: (1) Aggravated Robbery, in violation of R.C. 2911.01(A)(1)(c) a felony of the first degree, with a three-year firearm specification in violation of R.C. 2941.145(A); (2) Aggravated Burglary, in violation of R.C. 2911.11(A)(2)(B); a felony of the first degree with a three-year firearm specification in violation of R.C. 2941.145(A); (3) Grand Theft When the Property is a Firearm or Dangerous Ordnance, in violation of R.C. 2913.02(A)(1)(A)(3)(B)(4); a felony of the third degree; (4) Theft, a felony of the fifth degree in violation of R.C. 2913.02 (A)(1)(A)(3)(B)(2); (5) Attempted Grand Theft of a Motor Vehicle, a felony of the fifth degree in violation of R.C. 2923.02/2913.02(A)(1)(B)(5); and (6) Attempted Grand Theft of a Motor Vehicle, a felony of the fifth degree in violation of R.C. 2923.02/2913.02(A)(1)(B)(5).

{¶3} Chaney pled not guilty by reason of insanity and a Motion for Competency Evaluation was filed on June 9, 2021. A Competency Hearing was held on September 8, 2021. Both parties stipulated to the Psycho-Diagnostic evaluation finding that Chaney was Competent, and the Motion for Not Guilty by Reason of Insanity was Withdrawn on September 8, 2021.

{¶4} A jury trial began on October 25, 2021.

{¶5} Around 11:00 p.m. on May 2, 2021, Chad Garn arrived home. Garn parked his motorcycle, a 2017 Harley-Davidson Street Glide, in the garage, closed the garage door, and went inside the house to cook dinner. Garn turned on the television, ate his dinner, and then fell asleep on the couch in his living room.

{¶6} At approximately 2:00 a.m., Garn was awakened by a man pointing a gun at him and screaming, "Get up, go start your motorcycle." 2T. at 11.[1] Garn noticed that the intruder was wearing his black Harley-Davidson motorcycle jacket. The man stayed behind Garn while forcing him outside at gunpoint. Although it was still dark outside, the television was on in the living room, lights were on in both the kitchen and garage, and there was a streetlight. Id. 13-14; 27-28. Although Garn had parked the motorcycle in his garage the night before, he observed the motorcycle had been pushed down the driveway and out to the road. Id. at 15-16. Chaney told Garn to start the motorcycle for him so he could go. Id. at 15.

{¶7} When Garn was about halfway down the driveway, he realized he would need the key fob to start the motorcycle due to the bike's security system. 2T. at 15-16. Garn testified that he turned around to return to the house to get the fob, when he heard a click from the gun. Realizing that there were "[n]o bullets in the gun, [a] dry fire," Garn went after Chaney. Id. at 16. Chaney started to run. Garn pursued him; however, he lost him. Garn then went home and called 9-1-1.

{¶8} After the police arrived, Garn checked his property for missing items. He found that his credit cards, a Glock .45 caliber handgun, and a bag of change were missing. Garn also testified that a pair of binoculars were missing. Garn testified that the

---

[1] For clarity, the jury trial transcript will be referred to as, "__T.__," signifying the volume and the page number.

Glock, change, and credit cards were initially on his kitchen table. The bag of change was later found in Garn's motorcycle bag in his garage. Garn found a jacket and a flashlight that did not belong to him in his garage. Garn testified that he never touched these items.

{¶9} Upon inspecting his other vehicle, a Ford F-250 crew cab pickup truck, Garn discovered a screwdriver had been driven into the ignition in an effort to start it. The screwdriver destroyed the ignition, rendering the truck inoperable.

{¶10} Police received several phone calls, but one informant advised police that the perpetrator of the crimes at Garn's home could be found asleep at a table in a house on Eleanor Avenue. The caller was aware of the black Harley-Davidson jacket taken during the incident. 2T. at 76. Officers went to the house on Eleanor and, with consent to search, went inside. Id. at 78. Chaney's mother, father or step-father, and his brother were present at the time. Id. at 87. Chaney awoke and ran out the back door as officers entered the house. 2T. at 78. Officers apprehended Chaney on the porch. Id. Inside the house on Eleanor, officers recovered the stolen Harley-Davidson jacket along with Garn's credit cards in the jacket pocket. Id. at 79. In the basement, officers found the stolen Glock .45 handgun. Id. at 81.

{¶11} During the trial, Garn testified that the man who he alleged entered his home was Chaney. Garn further testified that the police showed him a picture on the officer's phone and ask him, "Is this the guy?" 2T. at 37;47. Neither the state nor the defense was aware of this identification from the picture. 2T. at 31. Garn testified that he was never shown any other photos of Chaney or anyone else.

{¶12} Defense counsel objected that neither the photograph, nor the fact of pretrial photographic identification were ever disclosed through discovery. 2T. at 31. The trial judge permitted defense counsel to question Garn regarding the circumstances of the photographic identification outside the presence of the jury. 2T. at 35. Garn testified the officer showed him the photo around an hour to an hour and a half after the event. Garn stated that it was never discussed with the officer how he got the photograph, but it looked like a picture from a Ring doorbell camera. 2T. at 37. The trial court overruled Chaney's motion for a mistrial.

{¶13} Andrew Sawin, a DNA analyst in forensic science at BCI, testified as an expert witness at trial regarding DNA analysis. Sawin testified concerning DNA collected and tested taken from the jacket and flashlight that did not belong to Garn that was recovered from Garn's garage after the incident.

{¶14} Sawin concluded Chaney's DNA standard was consistent with the DNA from one of the two major contributor DNA profiles from the jacket. 2T. at 116. The findings in Sawin's report indicate Chaney is included in the major DNA component. Sawin concluded that, in a group of one million random, unrelated people, only one person in that group could expect to be included. Chaney was also included with the major contributor of the DNA profile recovered from the flashlight. Sawin reported the estimated frequency of an individual being included in this mixture as one in 600 billion unrelated individuals. No latent fingerprints were found on any of the items according to a report authored by Rachel Keaton, a latent print examiner at BCI. 2T. at 130-132.

{¶15} Following deliberations, the jury returned verdicts finding Chaney guilty on all counts and attendant specifications as charged in the indictment. After the sentencing

hearing, the trial court journalized the judgment of conviction on November 3, 2021, with two subsequent nunc pro tunc entries. The trial court sentenced Chaney to six years in prison on the aggravated robbery, along with three years on the accompanying firearm specification, and merged one count of attempted grand theft of a motor vehicle into the aggravated robbery count. As to the aggravated burglary, the court sentenced Chaney to six years in prison, plus three years on the accompanying firearm specification, and merged the following into the aggravated burglary charge: grand theft of a firearm, theft, and the remaining count of attempted grand theft of a motor vehicle. The court ordered Chaney to serve all sentences consecutively, serving each of the three-year sentences on the firearm specifications consecutively and prior to the six-year sentence on count one and the six-year sentence on count two. Accordingly, Chaney received an aggregate sentence of an indefinite mandatory minimum prison term of eighteen years up to a maximum prison term of twenty-one years in prison.

*Assignments of Error*

{¶16} Chaney raises four Assignments of Error,

{¶17} "I. APPELLANT WAS DENIED DUE PROCESS AND A FAIR TRIAL, AS THE IDENTIFICATION PROCESS WAS UNRELIABLE, RESULTING IN A SUBSTANTIAL LIKELIHOOD OF MISIDENTIFICATION AND A TAINTED IN COURT IDENTIFICATION OF APPELLANT.

{¶18} "II. THE TRIAL COURT ERRED IN FAILING TO PROPERLY REMEDY THE INCLUSION OF IDENTIFICATION EVIDENCE INTO THE TRIAL THAT WAS NOT DISCLOSED THROUGH DISCOVERY.

{¶19} "III. APPELLANT'S COUNSEL WAS INEFFECTIVE WITH REGARDS TO PLEA NEGOTIATIONS, RESULTING IN APPELLANT BEING PREJUDICED BY RECEIVING A SIGNIFICANTLY HIGHER SENTENCE THAN HE WOULD HAVE OTHERWISE R E C E I V E D.

{¶20} "IV. APPELLANT'S CONVICTIONS OF THE CHARGES AGAINST HIM WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

I.

{¶21} In his First Assignment of Error, Chaney contends that he was denied due process of law and a fair trial because Garn's in-court identification was unreliable. Chaney claims that Garn's in court identification was tainted as a result of the police conducting an unduly suggestive pretrial photographic identification.

**Standard of Appellate Review**

{¶22} The Ohio Supreme Court has set forth our standard of review,

> In general, "'a constitutional error does not automatically require reversal of a conviction.'" *Weaver v. Massachusetts*, ⸺ U.S. ⸺, 137 S.Ct. 1899, 1907, 198 L.Ed.2d 420 (2017), quoting *Fulminante* at 306, 499 U.S. 279, 310, 111 S.Ct. 1246. For purposes of determining whether a conviction should be reversed, the Supreme Court has divided constitutional errors into two classes: "trial errors," which are reviewable for harmless error, and "structural errors," which are per se cause for reversal. *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 9, citing *Fulminante* at 306-312, 111 S.Ct. 1246, and *State v. Esparza*, 74 Ohio St.3d 660, 661, 660 N.E.2d 1194 (1996). Most constitutional errors

are trial errors. *United States v. Gonzalez-Lopez*, 548 U.S. 140, 148, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006). Trial errors occur during "'presentation of the case to the jury' and their effect may 'be quantitatively assessed in the context of other evidence presented in order to determine whether [they were] harmless beyond a reasonable doubt.'" (Brackets sic.) Id., quoting *Fulminante* at 307-308, 499 U.S. 279, 310, 111 S.Ct. 1246. A constitutional trial error is harmless when the state demonstrates "'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Weaver* at ——, 137 S.Ct. at 1907, *quoting Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

*State v. Montgomery,* Slip Op. 2022-Ohio-2211, ¶25 (June 30, 2022).

{¶23} The state "bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." *State v. Perry,* 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 15. Whether the defendant's substantial rights were affected depends on whether the error was prejudicial, i.e., whether it affected the outcome of the trial. *State v.* Fisher, 99 Ohio St.3d 127, 2003-Ohio-2761, 789 N.E.2d 222, ¶ 7. An appellate court is required to reverse the conviction when the state is unable to meet its burden. *Perry* at ¶ 15. See, also, *State v. West*, Slip Op. No. 2020-0978, 2022-Ohio-1556, ¶ 22.

### Pretrial police identification procedure

{¶24} Introducing as evidence the results of an unduly suggestive police identification procedure may violate a defendant's right to due process and require a trial court to suppress that evidence. *See Foster v. California*, 394 U.S. 440, 89 S.Ct. 1127,

22 L.Ed.2d 402 (1969) (finding that due process required the exclusion of an eyewitness identification obtained through a procedure making identification of the defendant inevitable). Due process concerns arise, however, only when (1) the identification procedure is arranged by law enforcement officials, (2) the procedure is unnecessarily suggestive, and (3) the procedure creates a substantial likelihood of misidentification. *See Perry v. New Hampshire,* 565 U.S. 228, 132 S.Ct. 716, 724, 181 L.Ed.2d 694 (2012). Moreover, even when police use an unduly suggestive procedure, due process does not necessarily require the suppression of the resulting identification. *Manson v. Brathwa*ite, 432 U.S. 98, 112–13, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). "Where the 'indicators of [a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed. Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury." Id. (citations omitted). *See, also, State v. Mitchell*, 5th Dist., Stark No. 2013CA00030, 2013–Ohio–3696, ¶ 21, 22.

**Issue for appellate review:** *Whether Chaney's substantial rights were affected by Garn's in-court identification of him as the intruder*

{¶25} In Ohio, R.C. 2933.83, Minimum requirements for live lineup or photo lineup procedures, suggests a preference for the double blind and sequential method as opposed to the traditional "six pack" array method for photo arrays. The statute provides, in part,

(6) "Folder system" means a system for conducting a photo lineup

that satisfies all of the following:

(a) The investigating officer uses one "suspect photograph" that resembles the description of the suspected perpetrator of the offense provided by the eyewitness, five "filler photographs" of persons not suspected of the offense that match the description of the suspected perpetrator but do not cause the suspect photograph to unduly stand out, four "blank photographs" that contain no images of any person, and ten empty folders.

(b) The investigating officer places one "filler photograph" into one of the empty folders and numbers it as folder 1.

(c) The administrator places the "suspect photograph" and the other four "filler photographs" into five other empty folders, shuffles the five folders so that the administrator is unaware of which folder contains the "suspect photograph," and numbers the five shuffled folders as folders 2 through 6.

(d) The administrator places the four "blank photographs" in the four remaining empty folders and numbers these folders as folders 7 through 10, and these folders serve as "dummy folders."

(e) The administrator provides instructions to the eyewitness as to the lineup procedure and informs the eyewitness that a photograph of the alleged perpetrator of the offense may or may not be included in the photographs the eyewitness is about to see and that the administrator does not know which, if any, of the folders contains the photograph of the alleged perpetrator. The administrator also shall instruct the eyewitness that the administrator does not want to view any of the photographs and will not view

any of the photographs and that the eyewitness may not show the administrator any of the photographs.  The administrator shall inform the eyewitness that if the eyewitness identifies a photograph as being the person the eyewitness saw the eyewitness shall identify the photograph only by the number of the photograph's corresponding folder.

(f) The administrator hands each of the ten folders to the eyewitness individually without looking at the photograph in the folder.  Each time the eyewitness has viewed a folder, the eyewitness indicates whether the photograph is of the person the eyewitness saw, indicates the degree of the eyewitness's confidence in this identification, and returns the folder and the photograph it contains to the administrator.

(g) The administrator follows the procedures specified in this division for a second viewing if the eyewitness requests to view each of the folders a second time, handing them to the eyewitness in the same order as during the first viewing; the eyewitness is not permitted to have more than two viewings of the folders; and the administrator preserves the order of the folders and the photographs they contain in a facedown position in order to document the steps specified in division (A)(6)(h) of this section.

(h) The administrator documents and records the results of the procedure described in divisions (A)(6)(a) to (f) of this section before the eyewitness views each of the folders a second time and before the administrator views any photograph that the eyewitness identifies as being of the person the eyewitness saw.  The documentation and record includes

the date, time, and location of the lineup procedure; the name of the administrator; the names of all of the individuals present during the lineup; the number of photographs shown to the eyewitness; copies of each photograph shown to the eyewitness; the order in which the folders were presented to the witness; the source of each photograph that was used in the procedure; a statement of the eyewitness's confidence in the eyewitness's own words as to the certainty of the eyewitness's identification of the photographs as being of the person the eyewitness saw that is taken immediately upon the reaction of the eyewitness to viewing the photograph; and any additional information the administrator considers pertinent to the lineup procedure. If the eyewitness views each of the folders a second time, the administrator shall document and record the statement of the eyewitness's confidence in the eyewitness's own words as to the certainty of the eyewitness's identification of a photograph as being of the person the eyewitness saw and document that the identification was made during a second viewing of each of the folders by the eyewitness.

(i) The administrator shall not say anything to the eyewitness or give any oral or nonverbal cues as to whether or not the eyewitness identified the "suspect photograph" until the administrator documents and records the results of the procedure described in divisions (A)(6)(a) to (g) of this section and the photo lineup has concluded.

See, *State v. Qirat,* 5th Dist. Licking No. 14-CA-72, 2015-Ohio-863, ¶31.

{¶26} When a police agency uses the double-blind method, a photo array is shown by a neutral officer without knowledge of who the targeted suspect is so that the officer cannot subconsciously or unintentionally communicate to the witness which photo should be selected.   The sequential-presentation method uses single photos of the suspect and other individuals, rather than the traditional "six-pack" array.   *State v. Monford*, 190 Ohio App.3d 35, 2010–Ohio–4732, 940 N.E.2d 634, ¶ 51–54(10th Dist.).

{¶27} A photo lineup is unduly suggestive if it "steers the witness to one suspect, independent of the witnesses' honest recollection." *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 208.   Identifications arising from single-photograph displays may be viewed in general with suspicion, *see Simmons v. United States*, 390 U.S. 377, 383, 88 S.Ct., at 967, 19 L.Ed.2d 1247(1968).   *Manson v. Brathwaite*, 432 U.S. 98, 116, 53 L.Ed.2d 140, 97 S.Ct. 2243, 2254 (1977).

{¶28} In the case at bar, Garn was shown a single photograph on an officer's cellular telephone which was apparently produced from a doorbell surveillance camera in the neighborhood.   One can hardly find a more suggestive identification procedure than the police showing the victim a single photograph and asking the victim, "Is this the guy." 2T. at 30; 43; 47. Clearly, the police did not use the statutorily accepted procedure for identification as set forth in R.C. 2933.83.   The question therefore becomes whether Garn's in-court identification of Chaney was tainted by the improper pre-trial identification procedure used by the Hartville Police Department in this case.

{¶29} If the defendant demonstrates the pretrial identification was unduly suggestive, "the court must then consider whether the identification, viewed under the totality of the circumstances, was reliable despite the suggestive procedure." *State v.*

*Dewberry*, 2d Dist. Montgomery No. 27434, 2020-Ohio-691, ¶ 73. Reliability is the linchpin in determining admissibility. "So long as the identification possesses sufficient aspects of reliability, there is no violation of due process." *State v. Sherls*, 2d Dist. Montgomery No. 18599, 2002 WL 254144, *3 (Feb. 22, 2002). In this situation, we turn to application of the test set forth by the U.S. Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972) to determine whether the witness was unlikely to have misidentified the defendant. Factors that affect reliability and, therefore, admissibility, include:

> "* * * the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Neil v. Biggers* (1972), 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401. Thus, although the identification procedure is suggestive, so long as the challenged identification itself is reliable, it is admissible. *Manson*, supra, 432 U.S. at 109, 97 S.Ct. at 2250, 53 L.Ed.2d at 151.

*State v. Moody*, 55 Ohio St.2d 64, 67, 377 N.E.2d 1008 (1978). Against these factors is to be weighed the corrupting effect of the suggestive identification itself. *Mason,* 432 U.S. at 114, 97 S.Ct. 2243, 53 L.Ed.2d 140.

*The opportunity of the witness to view the criminal at the time of the crime*

{¶30} Garn was awakened by an intruder. 2T. at 12. He was able to recall what the intruder was wearing, which was Garn's motorcycle jacket. Id. Garn testified that he

was able to look at Cheney "a couple times" because Garn kept turning around.  Id. at 13. The light was on inside the garage as the intruder forced him outside.  2T. at 13; 28.  He walked from his house halfway down the driveway when he realized he needed the key fob in order to start the motorcycle as the intruder was demanding he do.  Id. at 16.  The streetlights were on outside.  2T. at 28.  When he heard the gun click, he turned and ran toward his assailant.  Id. at 16-17.  Garn identified Chaney immediately when shown the picture one to one- and one-half hours after the incident.  2T. at 30; 35. At least five minutes elapsed from the time he was awakened to the time the intruder ran off.  2T. at 27.

*The witness' degree of attention*

{¶31} Garn was able to recall what the intruder was wearing and the fact that he had a gun.  However, Garn did not realize that it was Garn's gun that the intruder held. 2T. at 27.  Garn remembered hearing the gun click.  The area where the events occurred was lit.

*The accuracy of the witness' prior description of the criminal*

{¶32} No testimony was presented at trial that Garn had given a description of his assailant to the police.

*The level of certainty demonstrated by the witness at the confrontation*

{¶33} Garn identified Chaney immediately when shown the picture one to one- and one-half hours after the incident.  2T. at 30; 35. Garn did not hesitate in his in-court identification of Chaney as his assailant.  2T. at 14.  There was no dispute at trial that the photograph shown to Garn by the police was of Chaney.

*The length of time between the crime and the confrontation*

{¶34} The photographic identification occurred within one hour to one- and one-half hours after the incident.  The in-court identification took place nearly 6 months after the incident.

*Conclusion*

{¶35} In reviewing the circumstances surrounding the identification of Chaney in this case, we are not convinced that there was "a very substantial likelihood of irreparable misidentification."  *Simons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247(1968).  Garn had a direct line of sight to Chaney throughout the ordeal.  The area was sufficiently lit.  The ordeal lasted approximately five minutes giving Garn sufficient time to observe his assailant.  Nothing in the record suggests that Garn's in court identification of Chaney as his assailant, or Garn's testimony, was based upon or influenced by the photographic identification.  We conclude that Garn was unlikely to have misidentified Chaney.  *See Neil v. Bigger*s, 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

{¶36} Based upon the entire record before us, we conclude that any error in the admission of the photographic identification testimony did not affect the substantial rights of Chaney and was harmless beyond a reasonable doubt.

{¶37} Chaney's First Assignment of Error is overruled.

II.

{¶38} In his Second Assignment of Error, Chaney contends that the trial court should have granted a continuance when evidence that a photographic identification was

conducted by the police came to light for the first time during the state's examination of Garn.  [Appellant's brief at 17 - 18].

**Standard of Appellate Review**.

**{¶39}** Crim.R. 52 distinguishes between errors to which the defendant objected at trial and errors to which the defendant failed to object at trial.  *See State v. Perry*, 101 Ohio St.3d 118, 2004-Ohio-297, 802 N.E.2d 643, ¶ 14.  If the error is one to which the defendant objected at trial, an appellate court reviews the error under the Crim.R. 52(A) harmless-error standard and "the government bears the burden of demonstrating that the error did not affect the substantial rights of the defendant." (Emphasis sic.)  Id. at ¶ 15.  If the error is one to which the defendant failed to object at trial, an appellate court reviews the error under the Crim.R. 52(B) plain-error standard and "the defendant bears the burden of demonstrating that a plain error affected his substantial rights." (Emphasis sic.) Id. at ¶ 14.

**{¶40}** In the case at bar, Chaney's trial attorney never requested a continuance. We find that Chaney has forfeited all but plain error because his attorney failed to request a continuance.

**Issue for appellate review:** *Whether the trial court abused its discretion by not sua sponte granting a continuance*

**{¶41}** Chaney does not elucidate what evidence he would have presented had he been given a continuance.  In view of the admissibility of Garn's identification testimony as we have explained in our disposition of Chaney's First Assignment of Error, and further, in light of the overwhelming evidence presented at trial to support his guilt, Chaney has

failed in his burden to demonstrate that his substantial rights were violated by the trial court's failure to sua sponte grant him a continuance.

{¶42} Chaney's Second Assignment of Error is overruled.

III.

{¶43} In his Third Assignment of Error, Chaney argues that his trial counsel was ineffective during plea negotiations by failing to ensure he fully understood the plea offer and the consequences of not accepting the offer. As a result, Chaney contends, he was prejudiced by receiving a sentence that was much higher than offered during plea negotiations.

**Standard of Appellate Review**

{¶44} Defendants have a constitutional right to effective assistance of counsel during plea negotiations. *Hill v. Lockhart*, 474 U.S. 52, 58-59, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). The two-prong ineffective assistance of counsel analysis that the Supreme Court announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), applies to claims that counsel's performance was constitutionally deficient during plea negotiations. *Hill*, 474 U.S. at 58, 106 S.Ct. 366, 88 L.Ed.2d 203. A petitioner who claims that he was denied effective assistance of counsel with regard to whether or not to plead guilty must prove that (1) counsel rendered constitutionally deficient performance, and (2) there is a reasonable probability that but for counsel's deficient performance, the petitioner would have pled guilty. *Magana v. Hofbauer*, 263 F.3d 542, 547-48 (6th Cir.2001) (*citing Turner v. Tennessee*, 858 F.2d 1201, 1206 (6th Cir.1988)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052, 80 L.Ed.2d 674. *See, Missouri*

*v. Frye*, 566 U.S. 134, 132 S.Ct. 1399, 182 L.Ed.2d 379 (2012) and *Lafler v. Cooper,* 566 U.S. 156, 132 S.Ct. 1376, 182 L.Ed. 398 (2012).

{¶45} In *Frye,* defense counsel allowed a plea offer to expire without communicating the offer to the defendant resulting in the defendant accepting a later offer that was less favorable. *Frye,* at 1404. The Court held that "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea...." 132 S.Ct. at 1408. Given this duty, the Court emphasized that the right to effective assistance of counsel extends to the negotiation and consideration of plea offers that have been rejected or have lapsed. Id. at 1407–08.

{¶46} In *Lafler,* a favorable plea offer was reported to the client and rejected on the advice of counsel, who advised the defendant that the state could not prove intent because the victim was shot below the waist, even though the defendant shot the victim three times and missed her head once. The defendant took the case to trial and was convicted, after which he received a sentence more than three times higher than the plea offer. Notably, in an earlier communication with the trial court, the defendant had admitted guilt and expressed a willingness to accept the plea offer.

{¶47} In *Lafler*, the Court reiterated that the Sixth Amendment requires effective assistance not just at trial but at all critical stages of a criminal proceeding, including plea bargaining. 132 S.Ct. at 1384. In order to prevail on a claim of ineffective assistance of counsel when counsel's ineffective advice led to the rejection of a plea offer, the Court held that "a defendant must show that but for the ineffective advice, there is a reasonable probability that [1] the plea offer would have been presented to the court ...; [2] the court would have accepted [the plea];" and (3) the defendant was convicted of a more serious

offense or received a less favorable sentence than he would have received under the terms of the offer. Id. at 1385.

{¶48} However, defense counsel's deficient performance was stipulated in *Lafler.* *Id.* at 1383, 1391. The issue of deficient performance was not before the Court and was specifically not addressed. *Id.* at 1384, 1391. In fact, the Court declared, "an erroneous strategic prediction about the outcome of a trial is not necessarily deficient performance." *Id.* at 1391.

{¶49} An attorney's failure to convey a plea offer satisfies the first prong of *Strickland.* *Griffin v. United States*, 330 F.3d 733, 737 (6th Cir.2003). Further, a substantial disparity between the plea offer and the potential sentence exposure constitutes

> [S]trong evidence of a reasonable probability that a properly advised defendant would have accepted a guilty plea offer, despite earlier protestations of innocence. *See Magana v. Hofbauer*, 263 F.3d 542, 552-53 (6th Cir.2001) (finding the difference between a ten- and twenty-year sentence significant); *United States v. Day*, 969 F.2d 39 (3d Cir.1992) (finding ineffective assistance of counsel when trial counsel mistakenly described the penalties at trial as ten years rather than the twenty-two years the defendant received at sentencing, and where a plea offer of five years had been made); *United States v. Gordon*, 156 F.3d 376, 377-81 (2d Cir.1998) (holding that the wide disparity between the ten-year sentence recommended by the plea agreement and the seventeen-and-a-half years

the defendant did receive was objective evidence that a plea would have

been accepted).

*Turns v. United States,* S.D. Ohio No. 2:04-CV-769, CRIM 2:99-CR-104(1), 2005 WL

1847209 (Aug. 2, 2005) citing *Smith v. United States*, 348 F.3d 545, 552 (6th Cir.2003);

and *Griffin v. United States*, 330 F.3d 733, 739 (evidentiary hearing warranted to

determine whether defendant would have pleaded guilty where attorney failed to convey

plea offer of five years and defendant sentenced to 156 months.)

*The trial court informed Chaney of the state's plea offers in open court.*

**{¶50}** In the case at bar, the trial judge in open court with Chaney participating via

video feed from the Stark County Jail and his attorney present in the courtroom, explained

each charge and the potential sentences for each charge.  T. *FPT/Offer,* Oct. 21, 2021 at

5-9.  The trial judge explained the two plea offers.  Id. at 9-10.  The trial judge asked

Chaney if he had any questions concerning the potential penalties associated with the

charges, to which Chaney responded "No, ma'am.  Id. at 12.  The trial judge next asked

Chaney if he had any questions about the plea offers, to which he again responded, "No,

ma'am." Id. The trial judge then asked Chaney if there was anything the he would like to

tell her, to which Chaney replied, in part, that he had received the offers and had gone

over it all.  Id. at 13.

**{¶51}** Chaney insisted that because no DNA or fingerprints were found in May,

but that DNA has now been found on the flashlight he would be exonerated, in spite of

the trial judge's advising him that it would not exonerate him.  Id. at 23 - 26.

**{¶52}** The court finally stated to Chaney:

All right.  Well, your refusal to accept anybody's explanation other than yours, I think, concludes our discussion today.  If you change * * * your mind about the offer, let me know.  Or let your [attorney] know.  Otherwise, we will see you [for trial] on Monday.  Okay?

Id. at 25-26.  Chaney confirmed that they would proceed to trial by replying, "Yes, you will."  Id. at 26.

{¶53} The morning of trial, the court noted on the record that the state's offers placed on the record on October 21, 2021 as well as Chaney's counteroffer of October 22, 2021 had all been rejected.  1T. 8 -10[2].  The court inquired of the state, Chaney's trial counsel, and Chaney himself to confirm there was nothing more with respect to the offers or regarding resolution before trial began.  Id. at 9-10.

*Chaney rejected the state's offer*

{¶54} Unlike *Frye*, the evidence does not support the conclusion that an offer was made that defense counsel did not relay to the defendant.  In the case at bar, the trial judge explained the two offers to Chaney on the record.

{¶55} Unlike, *Lafler*, the record does not support that a favorable plea offer was reported to the client and rejected on the advice of counsel.  In the case at bar, the record makes clear that it was Chaney's decision to end the discussions with his attorney and proceed to trial.  Chaney makes no argument that his attorney advised him to reject either of the state's two plea offers.  There is no evidence in the record that indicates there was anything more his attorney could have done to have changed Chaney's mind to accept the plea.

---

[2] There is no description in the record concerning the specifics of Chaney's counteroffer of October 22, 2021.

{¶56} In the case at bar, nothing in the record suggests that Chaney would have pled guilty had his trial attorney done more to explain the plea offer to him. "Although Crim.R. 11 places an obligation on the court to inform a defendant that a guilty plea waives certain constitutional rights, the court has no duty to inform a defendant of the consequences of rejecting a plea." *State v. Valiente-Mendoza*, 6th Dist. Wood No. WD-16-067, 2018-Ohio-3090, ¶ 47. Likewise, counsel is neither obligated nor permitted to force a defendant to accept a plea offer against the defendant's will. In *Florida v. Nixon*, the United State Supreme Court made the following observation,

> A defendant, this Court affirmed, has "the ultimate authority" to determine "whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." *Jones v. Barnes*, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); *Wainwright v. Sykes*, 433 U.S. 72, 93, n. 1, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (Burger, C. J., concurring). Concerning those decisions, an attorney must both consult with the defendant and obtain consent to the recommended course of action.

> * * *

> While a guilty plea may be tactically advantageous for the defendant, [*Boykin v. Alabama*, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969)], at 240, 89 S.Ct. 1709, the plea is not simply a strategic choice; it is "itself a conviction," id., at 242, 89 S.Ct. 1709, and the high stakes for the defendant require "the utmost solicitude," id., at 243, 89 S.Ct. 1709. Accordingly, counsel lacks authority to consent to a guilty plea on a client's behalf, *Brookhart v. Janis*, 384 U.S. 1, 6-7, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966);

moreover, a defendant's tacit acquiescence in the decision to plead is insufficient to render the plea valid, *Boykin*, 395 U.S., at 242, 89 S.Ct. 1709. 534 U.S. 175, 187-188, 125 S.Ct. 551, 160 L.Ed.2d 565(2004).

{¶57} Chaney does not allege that counsel advised him to reject a favorable plea offer, but only that counsel did not try hard enough to convince him to accept the government's offer.  This does not render counsel's performance constitutionally ineffective.

{¶58} Accordingly, the record contains no credible evidence to prove that Chaney's trial attorney was constitutionally ineffective in her representation of Chaney during the plea negotiation process.

{¶59} Chaney's Third Assignment of Error is overruled.

IV.

{¶60} In his Fourth Assignment of Error, Chaney maintains that his convictions are against the manifest weight of the evidence.

**Standard of Appellate Review**

{¶61} As to the weight of the evidence, the issue is whether the jury created a manifest miscarriage of justice in resolving conflicting evidence, even though the evidence of guilt was legally sufficient.  *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *superseded by constitutional amendment on other grounds as stated by State v. Smith, 80 Ohio St.3d 89, 684 N.E.2d 668, 1997–Ohio–355*; *State v. Issa*, 93 Ohio St.3d 49, 67, 752 N.E.2d 904 (2001).

{¶62} Weight of the evidence addresses the evidence's effect of inducing belief. *State v. Thompkins*, *supra,* 78 Ohio St.3d at 386-387, 678 N.E.2d 541(1997), *State v.*

*Williams,* 99 Ohio St.3d 493, 2003-Ohio-4396, 794 N.E.2d 27, ¶83.   When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony.   *Thompkins* at 387, 678 N.E.2d 541, *citing Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652(1982) (quotation marks omitted); *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1244, ¶25, citing *Thompkins.*

{¶63} Once the reviewing court finishes its examination, an appellate court may not merely substitute its view for that of the jury, but must find that "'the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"   *State v. Thompkins, supra*, 78 Ohio St.3d at 387, *quoting State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717, 720–721(1st Dist. 1983).   Accordingly, reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction."   Id.

**Issue for Appellate Review**:  *Whether the jury clearly lost their way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.*

{¶64} We find that this is not an "'exceptional case in which the evidence weighs heavily against the conviction.'"   *State v. Thompkins*, 78 Ohio St.3d 380, 386–387, 678 N.E.2d 541 (1997), *quoting Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.  Based upon the foregoing and the entire record in this matter we find Chaney's convictions are not against the sufficiency or the manifest weight of the evidence.   To the contrary, the jury

appears to have fairly and impartially decided the matters before them. The jury heard the witnesses, evaluated the evidence, and was convinced of Chaney's guilt.

{¶65} Upon review of the entire record, weighing the evidence and all reasonable inferences as a thirteenth juror, including considering the credibility of witnesses, we cannot reach the conclusion that the trier of facts lost its way and created a manifest miscarriage of justice. We do not find the jury erred when it found Chaney guilty. Taken as a whole, the testimony and record contains ample evidence of Chaney's responsibility for all of the alleged crimes. The fact that the jury chose to believe the testimony of the victim does not, in and of itself, render his convictions against the manifest weight of the evidence. While Chaney is certainly free to argue that his brother could have committed the crimes, and that the eyewitness identification was unreliable, on a full review of the record we cannot say that the jury clearly lost its way or created a manifest injustice by choosing to believe the testimony.

{¶66} The state presented testimony and evidence from which the jury could have found all the essential elements of the offenses proven beyond a reasonable doubt. The fact that the state may have relied on circumstantial evidence in proving Chaney's guilt does not make his convictions any less sound.

{¶67} Finally, upon careful consideration of the record in its entirety, we find that there is substantial evidence presented which if believed, proves all the elements of the crimes for which Chaney was convicted.

{¶68} Chaney's Fourth Assignment of Error is overruled.

{¶69} The judgment of the Stark County Court of Common Pleas is affirmed.


By Gwin, J.,

Wise, Earle, P.J., and

Baldwin, J., concur